# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 24

**OCTOBER TERM, A.D. 2021**

**February 10, 2022**

IN THE INTEREST OF: SMD and SND,
minor children,

TD,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

IN THE INTEREST OF: SMD and SND,
minor children,

KL-R,

Appellant
(Respondent),

v.

THE STATE OF WYOMING

Appellee
(Petitioner).

S-21-0117, S-21-0118

*Appeal from the District Court of Sheridan County*
*The Honorable John G. Fenn, Judge*

*Representing TD:*
>   Jordan J. Camino, The Wages Group, LLC, Buffalo, Wyoming.  Argument by Ms. Camino.

*Representing KL-R:*
>   Sarah G.R. Phillips, Bighorn Mountain Legal Services, LLC, Sheridan, Wyoming.  Argument by Ms. Phillips.

*Representing the State of Wyoming:*
>   Bridget Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Wendy S. Ross, Senior Assistant Attorney General.  Argument by Ms. Ross.

*Guardian ad Litem:*
>   Joseph R. Belcher, Director, Wyoming Office of the Guardian ad Litem; Kim Skoutary Johnson, Chief Trial and Appellate Counsel; Jordan Martin, Student Extern.

***Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.***

\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   KL-R (Mother) and TD (Father) appeal the juvenile court's order changing the permanency plan for their children, SMD and SND, from reunification to adoption. Their appeals have been consolidated. Mother and Father each contend that the juvenile court abused its discretion by ordering a change in the plan to adoption and not guardianship. Mother further contends that the juvenile court abused its discretion when it did not order a concurrent plan of reunification and determined reunification efforts could cease. We affirm.

*ISSUES*

[¶2]   The issues are:

1.   Did the juvenile court abuse its discretion when it found that it was in the children's best interests to change the permanency plan to adoption instead of guardianship?

2.   Did the juvenile court abuse its discretion when it determined there was no need for a concurrent plan of reunification when it determined DFS could cease reunification efforts?

*FACTS*

**A.   Factual Background**

[¶3]   Mother had four children, ERLA (age nine), ELLA (age six), SMD (age three), and SND (age two). Mother's ex-husband, JL-R, is the father of ERLA and ELLA. Mother's live-in boyfriend (Father) is the father of SMD and SND. This case involves only SMD and SND; the other children are addressed only peripherally as relevant to the issues here. All three parents and the four children lived together. On December 2, 2018, Mother and Father had a verbal dispute at the family residence. The dispute escalated and Mother responded by cutting her wrists with a kitchen knife. Law enforcement arrived at the home. While attending to Mother and sorting the situation out, they found the home to be unsanitary—animal feces and urine covered the floor, the kitchen sink contained moldy dishes, dirty clothes and garbage cluttered the home, the children's mattresses were uncovered with holes in them, and the walls were smeared with dirt and mud. All four children were taken into protective custody, and Mother, Father, and JL-R were cited for child endangerment. Father and JL-R were arrested and taken to jail. Mother was placed on a psychiatric hold at a local hospital.

1

[¶4]     The next day, the Sheridan County Attorney filed a petition alleging that Mother, Father, and JL-R had neglected the children.  At the December 4, 2018 shelter care hearing, all parents denied the neglect allegations.  The juvenile court placed the children in the legal and physical custody of the Department of Family Services (DFS).  DFS then placed the children in relative foster care with their maternal grandparents.  Later, all parents pled no contest to the neglect petition, and the children were adjudicated as neglected.

[¶5]     In early April 2019, DFS filed its Predisposition Report and case plan.  The Predisposition Report detailed Mother's and Father's history of mental health and substance abuse issues.  It also summarized the family's history with DFS.[1]

[¶6]     The case plan required both Mother and Father to work on long-term sobriety, parenting education, mental health, and stability (including housing, employment, and transportation).  It also required Mother and Father to obtain substance abuse evaluations (and follow the recommendations); complete random urinalysis (UA) testing; attend and complete the Compass Nurturing Parenting class (and follow through with recommendations after completion); attend couples counseling for a minimum of eight sessions (and follow through with provider recommendations); obtain and maintain employment to provide for the children's basic needs; obtain and maintain safe and adequate housing; obtain and maintain reliable transportation; and attend scheduled appointments for a minimum of three months.  Specific to Mother, the case plan required that she follow through with all recommendations of her most recent psychological evaluation; complete an additional evaluation to identify specific personality and parenting capacity issues (and follow through with any recommendations); continue attending the Psychosocial Rehabilitation Program through Northern Wyoming Mental Health Center (NWMHC) for six consecutive months (and follow through with recommendations); continue attending medication management through NWMHC, and take prescribed psychiatric medications (and follow through with recommendations).  Separate from Mother, the case plan required Father to schedule a medication evaluation (and follow any recommendations from that evaluation).  The juvenile court adopted the case plan and ordered Mother and Father to complete the tasks set forth.

B.     **December 2018 through November 2019**

[¶7]     Early on, Mother and Father had varied success.  Father held three jobs but had lost them all by the end of April 2019; he was following the terms of his probation; he started a parenting education program and attended supervised visits with all four children but missed several appointments; and he completed his first substance abuse evaluation but

---

[1] Between June 2014 and October 2017, DFS opened five intakes related to Mother's and Father's inability to care for their children, substance abuse, and domestic violence.  Father was cited for child endangerment in 2015.  In 2016, shortly after her birth, SND was placed in protective custody due to her failure to thrive. Between April 2016 through May 2018, Mother and Father had two voluntary cases with DFS.

used methamphetamine. Mother obtained a part-time job, began receiving psychological services, indicated she was thinking about moving to a better place for the children, and was going to reapply for Social Security benefits; but she also relapsed, using controlled substances. On March 21, 2019, both Mother and Father spent three days in jail after failing random UA tests.

### 1. Father

[¶8]    Tragically, on April 22, 2019, ELLA was hurt in a school accident, and died several days later.[2]  On May 5, 2019, Father began drinking heavily and got into an altercation with JA, the children's maternal grandfather and foster parent, who had also been drinking. SMD and SND, who were in the care of JA and their maternal grandmother, RA, were temporarily relocated to another foster care home. They were returned to RA on May 24, 2019. As a result of this incident, Father was charged with battery and was arrested.[3]  The charge led to an emergency review hearing, after which the permanency plan remained reunification with a concurrent plan of adoption. Father was incarcerated from May 5 through November 24, 2019. During that time, Father was sober, took his medication, completed parenting education homework provided by DFS, and continued to have phone and video visits with the children. He received an addiction assessment or Addiction Severity Index (ASI).[4]  Although his ASI recommended outpatient treatment, it was the view of the Multidisciplinary Team (MDT)[5] that he should attend inpatient treatment on his release from jail. Father agreed, and he was granted an early release to attend an inpatient treatment program beginning on November 25, 2019.

---

[2] ELLA was dismissed from the case. ERLA and JL-R were eventually reunified and were both subsequently dismissed.

[3] Father's brief indicates he was incarcerated a third time, from April 18–21, 2019; but it is unclear from the record the reason for that incarceration.

[4] A more complete explanation of the assessment is:

> Addiction Severity Index (ASI) is an assessment tool widely used in the evaluation of substance abuse treatment. This tool serves as a guidance instrument in treatment planning. This instrument is an interview process that assesses history, frequency, and consequences of alcohol and drug use.

Samuel B. Obembe, *Practical Skills and Clinical Management of Alcoholism & Drug Addiction* (2012) https://www.sciencedirect.com/topics/medicine-and-dentistry/addiction-severity-index.

[5] Multidisciplinary teams are:

> often used to enhance and improve investigations and responses for children and families. Multidisciplinary teams represent a variety of disciplines that interact and coordinate their efforts to diagnose, treat, and plan for children and families receiving child welfare services. They may also be referred to as a "child protection team," "interdisciplinary team," or "case consultation team."

*Multidisciplinary Teams*, Child Welfare Information Gateway, https://www.childwelfare.gov/topics/responding/iia/investigation/multidisciplinary/ (last visited Jan. 27, 2022).

### 2. Mother

[¶9]    The May 17, 2019 MDT report indicated Mother had a full-time job and was on a list for a better apartment.  She had completed psychological testing (and scheduled additional recommended testing) and was engaged in individual counseling.  She had a vehicle and was attending supervised visits with the children.  By August, Mother was missing therapy appointments and expressing dissatisfaction with her job.  Nevertheless, she maintained steady employment, felt good about her recovery, and had remained sober.  She was doing well with the children and had progressed to having visits supervised by her mother, RA.  By October 2019, Mother's employment had changed to part time, and she was not attending therapy.  She was borrowing money from friends to pay her rent and food.  However, her apartment was clean and well maintained, and she had transitioned to unsupervised visitation including overnight visits.

## C.    December 2019 through April 2020

[¶10]  The first permanency hearing was held in early December 2019.  The juvenile court continued the permanency plan of reunification and removed the concurrent plan of adoption.  The court ordered Father to complete inpatient treatment, obtain employment, and abide by the conditions of his probation.  It ordered Mother to maintain her employment and housing and to continue with her psychiatric medications and receiving psychiatric care.

### 1. Father

[¶11]  February 21, 2020, Father was released from the inpatient treatment program.  He received a rating of "maximum benefit," but because he had not attempted to change his addictive behaviors, he did not receive a certificate of successful completion.[6]  Father was able to find a job after his discharge, but he immediately began drinking and, by April 2020, he had begun using methamphetamine and marijuana.  He lost his job and started working landscaping jobs "under the table."  He did not have stable housing, instead he stayed at the homes of various friends.  Father's parenting skills caused concern.  For example, he raised his voice and issued punishments at inappropriate times during his supervised visits.  On May 1, 2020, Father was arrested on an outstanding warrant and his probation was revoked; he remained in jail until May 30, 2020.

---

[6] Father's clinician explained that Father was in inpatient treatment for the maximum time allowed and, while he demonstrated an awareness of his substance abuse issues, he had not modified his behavior enough to change.  The result was that he received "maximum benefit" (the most benefit he could gain from the program given his resistance to change), but he did not receive certification that he had completed treatment.  Father's "prognosis was guarded and was contingent on his willingness and diligence to apply himself with the knowledge and tools he gained in treatment."

### 2. Mother

[¶12]   At the end of December 2019, DFS placed the children in Mother's home on a trial basis.  Between January and April 2020, Mother continued to comply with her case plan.  She kept her apartment but struggled to keep it and her children clean.  She continued to maintain sobriety.  On March 20, 2020, Mother lost her job due to the COVID-19 pandemic but applied for and was receiving unemployment benefits.  On April 21, 2020, a DFS representative visited Mother's home and observed that Mother seemed "off," SND had a black eye, and SND and SMD had bruising on other parts of their bodies that Mother could not explain.  This led to DFS' concern about Mother's ability to supervise the children.  On April 22, 2020, Mother indicated to her aunt that someone had held a gun to her head because she owed him money for drugs.  During the ensuing welfare check, an officer removed drug paraphernalia from Mother's home and reported that the home was dirty, with moldy food, and dog feces on the floor.  Mother admitted to marijuana and methamphetamine use.  DFS removed the children and returned them to foster care with their maternal grandparents.  Mother was cited and arrested for breach of the peace and for being under the influence.  She bonded out of jail on May 5, 2020.

### D.      May 2020 through December 2020

[¶13]   At the May 2020 MDT meeting, various team members recommended a change in the permanency plan for SMD and SND to adoption, nevertheless the plan remained reunification.  Between May and December 2020, Mother and Father continued to regress.

### 1. Father

[¶14]   Father's alcohol and drug use continued and first resulted in a reduction in visitation, and then no visitation from July to December 2020.  He tested positive for alcohol in violation of his probation conditions.  In September, Father broke into Mother's home and strangled Mother.  He failed to attend scheduled therapy sessions and failed to follow recommendations for medication management and substance abuse treatment.  At times, it was unclear where he was residing or whether he had left the state—he reported he was in California, but DFS had been advised he was living in Oregon.  Father admitted to daily use of intravenous (IV) drugs and to sharing needles with Mother.  On October 29, he and Mother were arrested for breaking and entering and possession of marijuana.[7]

### 2. Mother

[¶15]   Mother also continued to use alcohol and drugs, including IV methamphetamine.  By September 2020, Mother had numerous positive UA tests and missed UA appointments;

---

[7] This was the third time Father was charged with possession; accordingly, he was charged with a felony pursuant to Wyo. Stat. Ann. § 35-7-1031(c)(i).

she had stopped going to therapy, and she was not attending drug use prevention group meetings. As a result, Mother's visitation was reduced. Inpatient treatment was proposed, but Mother refused. Mother remained unemployed and was evicted from her home in September 2020.

[¶16] At the September 2020 MDT meeting, the team again discussed changing the permanency plan to adoption or guardianship but continued the plan of reunification. In October, Mother was advised that in-person visits with her children would not occur until she obtained negative UA tests. Mother refused testing. On October 29, 2020, Mother (along with Father) was arrested for breaking and entering and possession of marijuana. During her incarceration, Mother was treated for an infection due to IV drug use. Both Mother and Father remained in jail at the time of the December 2020 MDT meeting. At the meeting, the team recommended that the permanency plan change to adoption.

### E.    December 2020 Permanency Hearing

[¶17] The juvenile court held a permanency hearing on December 14 and 15, 2020. At the permanency hearing, the juvenile court heard testimony from DFS caseworker, Ashley Handley; Father's former probation officer, Jessica Slack; the children's maternal grandmother and foster parent, RA; Mother; Father; and JL-R.

[¶18] Ms. Handley testified regarding DFS efforts to reunify the family. She explained that Mother initially made progress under the case plan and completed the parenting education component of the plan. However, Mother significantly regressed in almost every area of the plan during the duration of the case: Mother had not maintained sobriety; she had repeatedly tested positive for amphetamine, methamphetamine, marijuana, and alcohol; and at times, Mother failed to show for testing. It was only recently that Mother indicated she would like to attend inpatient substance abuse treatment. Ms. Handley was uncertain when a bed would become available, whether Mother would follow through with that treatment, or whether it would be successful. Mother made no progress with her mental health. Her initial attendance in therapy was "sporadic" and "inconsisten[t]"; and, over time, her attendance dwindled. She would not engage in medication management services. By the time of the hearing, she was not taking advantage of any mental health services, and she had at least two pending criminal charges. Housing, employment, and transportation had been issues for both parents throughout the case. Mother "struggled . . . significantly" maintaining employment, and at the time of the hearing, Mother was unemployed and had no means of transport. Ms. Handley testified that the COVID-19 pandemic affected Mother's employment, but it was not the reason why Mother remained unemployed at the time of the hearing. Mother did not have consistent living arrangements—she was evicted from her home and lived with friends until she was incarcerated, and, at the time of the hearing, was residing at the Super Saver Inn.

[¶19]   Ms. Handley testified that Father had been incarcerated for much of the case, and, at the time of the hearing had one pending felony charge.  Father was able to complete the parenting education part of the case plan.  Ms. Handley testified that Father failed to maintain sobriety and made no progress in achieving that goal.  Father reported drinking the night after he was discharged from inpatient treatment and had taken IV drugs daily.  Father had made no progress in his mental health—since discharge from inpatient treatment, he "failed to engage in any mental health services to any degree."  Father was rarely employed and had no transportation when he was not in jail.  Father "never had housing throughout the duration of this case."  When he was not incarcerated or in inpatient treatment, he lived with friends and had traveled to Oregon, where he lived with his father for a brief time.  At times, Ms. Handley was unsure where Father was residing because he had not kept in contact with DFS.

[¶20]   Ms. Handley also testified that since the children have been with their foster parents, maternal grandmother and grandfather, they had progressed and that they "do much better in a stable environment" that the grandparents provide.  She concluded that DFS recommended the permanency plan be changed from reunification to adoption with relatives to give the children permanency and stability over the long term.  DFS would not recommend guardianship, but regardless of the change in plan, DFS would facilitate visits so that Mother and Father would be able to have relationships with the children, so long as they remained sober.

[¶21]   Ms. Slack was Father's probation officer and a member of the MDT.  Ms. Slack testified that from the start of this case to the permanency hearing in December 2020, Father's probation was revoked three times.[8]  She testified that during the two-year period that she acted as his probation officer, she had trouble locating Father and that he continued to use controlled substances.  She also testified that in prior, unrelated cases where she supervised him, substance abuse was an issue for Father.

[¶22] RA, the children's maternal grandmother, testified that she had cared for the children nearly continuously from the beginning of the case in December 2018.[9]  She testified regarding the children's routine, improvements in their behavior, school performance, and hygiene during this time.  She explained that while the children were with Mother for the trial period, they visited her "off and on" and during that time, their behavior was "erratic," and their hygiene was not good—their hair was not brushed, they wore mismatched clothing, and were "not so clean."  After they returned to her care, they had fallen into old behavioral habits and the transition was "a little rough."  RA testified that she did not think Mother or Father were ready to parent the children or that they could

---

[8] Probation was revoked the first time in May 2019, the second time on May 4, 2020, and the third time on November 2, 2020.

[9] RA cared for the children at all times except for two weeks after ELLA died, during their temporary foster care placement after Father's altercation with JA, and during the trial visitation with Mother.

provide them a safe and stable environment. She testified regarding Mother's mental health difficulties, both growing up and currently. RA testified that her preference was a permanency plan that would provide the children with a good education and a path toward a successful life. She felt if they remained with her, she could provide that path. RA also testified that if the permanency plan changed to termination, she would be happy to continue to care for them and she would allow the children to see Mother and Father, so long as Mother and Father were clean (not using drugs or alcohol).

[¶23] Mother testified that she lost her job at Burger King because the COVID-19 pandemic caused it to shut down. After that, she was on unemployment. She testified that her relapse in April 2020 was due to the anniversary of ELLA's death and her struggle to provide for the other children. She testified that she would like to receive inpatient treatment and that she had applied to a program. Mother indicated that she would prefer the permanency plan change to guardianship because, although "it's not best for" her kids to be with her "right now," with a guardianship, after she "get[s] stable enough," she could regain custody.

[¶24] Father testified regarding the various jobs he held when he was not incarcerated, his mental health and medications, and his substance abuse. He indicated that he relapsed in April 2020 on the anniversary of ELLA's death and then "us[ed] really heavily" throughout the summer. He also testified that the COVID-19 pandemic interfered with his ability to obtain consistent care after he was released from inpatient treatment. He testified that his current plan was to repeat inpatient treatment. He testified that he has been incarcerated or on probation for nearly all twenty-four months of the case. He also testified regarding the impact of his incarceration on his participation in the case—hindering his ability to get the help he needed, decreasing the time he could spend with the children, requiring visitation by video, and participation in MDT meetings over the phone. Father testified that he believed it was in the children's best interests to stay with their maternal grandparents, but he preferred the plan be changed to guardianship over adoption to give him and Mother a chance to get their lives in order and then "take accountability" for the children.

[¶25] Finally, JL-R testified that he would be willing to adopt the children so that all three, ERLA, SMD, and SND, could be together.

[¶26] After hearing this evidence, the juvenile court took the matter under advisement. On February 11, 2021, it issued an order changing the permanency goal to adoption and relieving DFS of making further efforts to reunify the family. Mother and Father appeal.

*STANDARD OF REVIEW*

[¶27] We review a juvenile court's change in permanency plan for abuse of discretion. *KC v. State*, 2015 WY 73, ¶ 18, 351 P.3d 236, 242 (Wyo. 2015); *In re RE*, 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo. 2011). "A court does not abuse its discretion unless it

acts in a manner which exceeds the bounds of reason under the circumstances." *Int. of AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021) (quoting *Int. of: AA*, 2021 WY 18, ¶ 33, 479 P.3d 1252, 1261 (Wyo. 2021)).  To the extent Mother and Father challenge the sufficiency of the evidence to support the juvenile court's decision, "we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party."  *Id.* (quoting *Matter of JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 180 (Wyo. 2021)). Mother's assertion that the juvenile court erred as a matter of law when it determined reasonable efforts should cease requires statutory interpretation, which we review de novo. *Int. of VS*, 2018 WY 119, ¶ 38, 429 P.3d 14, 25 (Wyo. 2018); *In re CRA*, 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016).

## DISCUSSION

**I.  *Did the juvenile court abuse its discretion when it found that it was in the children's best interests to change the permanency plan to adoption instead of guardianship?***

[¶28]  At the permanency hearing, Mother and Father argued for a permanency plan of guardianship to give them more time to become fit parents.  Mother and Father both argued that the juvenile court's decision to change the permanency plan to adoption instead of guardianship was unsupported by substantial evidence and was an abuse of discretion.

## A.  Permanency Hearings in Wyoming

[¶29]  When a child is placed outside the parental home, the juvenile court conducts permanency hearings a minimum of every twelve months.  Wyo. Stat. Ann. § 14-3-431(d). At such hearings, DFS must:

> present to the court [the] [e]fforts made to [e]ffectuate the permanency plan for the child, address the options for the child's permanent placement, examine the reasons for excluding other permanency options and set forth the proposed plan to carry out the placement decision, including specific times for achieving the permanency plan[.]

Wyo. Stat. Ann. § 14-3-431(j)(i)(A) (LexisNexis 2021).

[¶30]  At the permanency hearing, the juvenile court must "[d]etermine whether the permanency plan is in the best interest of the child and whether the department of family services has made reasonable efforts to finalize the plan[.]"  Wyo. Stat. Ann. § 14-3-431(k)(i).  When the State seeks to change the permanency plan, the State has the burden of establishing by a preponderance of the evidence that a change in the plan is in the best

9

interests of the child. *KC*, ¶¶ 25, 44, 351 P.3d at 243, 247. "If the court finds that reasonable efforts to reunite the child with his parent are not required (or are no longer required), and that the child's best interests require something other than family reunification, it will change the permanency plan accordingly." *Id.* ¶ 25, 351 P.3d at 243.[10]

## B.    Sufficient Evidence Supported the Juvenile Court's Decision to Change the Plan to Adoption

[¶31]  We first address the argument that there was insufficient evidence to change the plan to adoption.

[¶32]  Mother argues that the juvenile court's findings that she had not made any progress toward reunification were "contrary to the weight of the evidence." Father asserts that his participation in the case was impacted by his grief over ELLA's death and COVID-19, but he had made progress and "start[ed] to put the pieces together regarding his recovery."

[¶33]  In *In re ARC*, we considered whether termination of parental rights was justified under similar circumstances.[11] There, the mother "only occasionally showed up for UAs, many of which were positive for illegal drug use." *In re ARC*, 2011 WY 119, ¶ 27, 258 P.3d 704, 710 (Wyo. 2011). At the termination of parental rights hearing, however, the mother testified that she had become sober. *Id.* We affirmed the termination of her parental rights based on missed and failed drug tests and her ultimate failure to address her substance abuse problems. *Id.* ¶ 32, 258 P.3d at 711.

[¶34]  Similarly, in *KC*, we considered whether the juvenile court abused its discretion when it changed the permanency plan to adoption. Significant factors leading to the change in plan were Mother's repeated failures to appear for required drug testing and failing the numerous drug tests that she did take. These failures indicated she had an ongoing substance abuse problem. Mother also had other "ongoing problems with maintaining steady employment and cooperating with the counseling required by the plan." *KC*, ¶¶ 54–56, 351 P.3d at 249. We held that the juvenile court's finding that Mother failed to comply with her case plan was "well-supported by the record, and was proven by a preponderance of the evidence[.]" *Id.*

---

[10] "If the permanency plan is adoption or any other alternative arrangement requiring the parents' rights to be severed, the next step will normally be for the State to file an action for termination of parental rights on the grounds stated in Wyo. Stat. Ann. § 14-2-309(a)(i)–(viii)." *KC*, ¶ 26, 351 P.3d at 243–44. "The termination action is not conducted in the juvenile court, but is rather a separate action which must be filed in district court." *Id.*

[11] In a termination of parental rights case, grounds for termination must be established by clear and convincing evidence, a higher burden of proof than imposed in cases where DFS seeks to change the permanency plan. Wyo. Stat. Ann. § 14-2-309(a). However, when a change in the permanency plan is sought, as it was here, the State must prove grounds for that change by a preponderance of the evidence. *KC*, ¶ 37, 351 P.3d at 246.

10

[¶35]   In this case, while both Mother and Father initially made progress on their case plan, after two years they had regressed to the point that little progress had been made overall. Naturally, ELLA's untimely death and the repercussions of the COVID-19 pandemic took a toll on the family.  However, Mother and Father had multiple opportunities and over two years to sort out their issues and comply with the case plan.  By the end of the two-year period, both parents were incarcerated; both continued to use drugs; both struggled with their mental health, housing, and employment; and both admitted to needing more time to comply with the plan.  The juvenile court's finding that Mother and Father "made little to no progress" is supported by a preponderance of the evidence. *See supra* ¶¶ 18–19.  As we explained in *Int. of SW*, where DFS endeavored to provide services over the course of a two-year period, "[c]hildren do not have the luxury of time.  'At some point, the rights and needs of the children rise above the rights and needs of the parents.'" *Int. of SW*, 2021 WY 81, ¶¶ 27–28, 491 P.3d 264, 271–72 (Wyo. 2021) (quotation omitted).

## C.     The Juvenile Court Did Not Abuse Its Discretion When It Chose to Change the Plan to Adoption Instead of Guardianship

[¶36] Mother and Father also challenge the juvenile court's findings regarding guardianship and its subsequent decision to change the plan to adoption.  The juvenile court found:

> Under W.S. § 3-3-1105, a petition to terminate a guardianship may be filed every six (6) months.  Further, once a petition to terminate the guardianship was filed, the burden would be on the guardian to prove that [Father and Mother] were unfit. *In re SRB-M*, 2009 WY 22, ¶ 23, 201 P.3d 1115, 1121 (Wyo. 2009) ("Just as a non-parent seeking the appointment of a guardian over the parent's objection has the burden of proving the parent unfit by a preponderance of the evidence, a non-parent seeking to continue a guardianship over the parent's objection has the burden of proving the parent unfit.").
>
> SMD and SND are still very young, and it would not be in their best interests to have their living arrangements re-litigated every six months.  Further, both [Father and Mother] admitted that it could take years for them to become sober and stable.  This would mean that SMD and SND would be forced to leave a stable home where they had lived for years and return to [Father and Mother], where another relapse is always a possibility.

> After considering all of the evidence, the Court finds that it is in the children's best interest to change the permanency plan to adoption.

[¶37] Mother contends that the juvenile court's findings regarding the potential for litigating the guardianship were "entirely speculative"; Father "disagrees" with the juvenile court's conclusion that "guardianship is not a permanent placement plan."

[¶38] At the permanency hearing, DFS is required to present to the juvenile court "options for the child's permanent placement," "set forth the proposed plan," and provide "reasons for excluding other permanency options[.]" Wyo. Stat. Ann. § 14-3-431(j)(i)(A). Permanency options are set forth in the federal Adoption and Safe Families Act—reunification, adoption (including relative and non-relative adoption), guardianship (including relative and non-relative guardianship), permanent placement with a fit and willing relative, and other planned permanent living arrangements. 42 U.S.C. § 675(5)(C)(i).[12] Some courts have held that the Adoption and Safe Families Act establishes a hierarchy of permanency; that is, reunification is preferred, with preference for the remaining options following in order—adoption, then guardianship, permanent placement with a relative, and, finally, other permanent living arrangements. *See, e.g.*, *In re Jaseven*

---

[12] The act arose because:

> During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as "foster care drift" and resulted in the enactment by Congress of Public Law 96-272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. §§ [670–679 (1988)]. One of the importan[t] purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.
>
> [The act requires] a state . . . , among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1).

*In re Adoption/Guardianship Nos. J9610436 & J9711031*, 796 A.2d 778, 783–84 (Md. 2002) (quoting *In re Adoption/Guardianship No. 10941 in Cir. Ct. for Montgomery Cnty.*, 642 A.2d 201, 204 (Md. 1994)).

Wyoming receives federal funds pursuant to Adoption and Safe Families Act. Accordingly, the Wyoming legislature has enacted legislation to comply with the federal requirements. *In re A.D.*, 2007 WY 23, ¶ 32, 151 P.3d 1102, 1110 (Wyo. 2007). Under Wyoming's Child Protection Act, for those children found to be neglected, DFS is required to develop and implement a permanency plan that is in the best interest of the child. Wyo. Stat. Ann. §§ 14-3-427(f), 14-3-431(j) & (k).

*H.*, No. W10CP12016166A, 2013 WL 1223856, at \*3 (Conn. Super. Ct. Mar. 6, 2013); *New Jersey Div. of Youth & Fam. Servs. v. L.H.*, No. A-6435-06T4, 2008 WL 2649167, at \*9 (N.J. Super. Ct. App. Div. July 8, 2008) (trial court was precluded from considering guardianship when adoption was a feasible and likely option); *In re Jose V.*, 58 Cal. Rptr. 2d 684, 688–89 (Ct. App. 1996), superseded by statute. Other states have codified the hierarchy. *See, e.g.*, Md. Code Ann., Fam. Law § 5-525(c) (setting forth placement options in descending priority); 42 Pa. Stat. and Cons. Stat. Ann. § 6351(f)(1) (same); Cal. Welf. & Inst. Code § 366.26(4)(A); *see also In re Adoption/Guardianship of Victor A.*, 872 A.2d 662, 671 (Md. 2005); *In re B.S.*, ¶ 6, 861 A.2d 974, 976–77 (Pa. Super. Ct. 2004), *In re Doe*, No. 40786, 2013 WL 6009213, at \*7 (Idaho Ct. App. July 26, 2013) (discussing hierarchy of placement in the ICWA, 25 U.S.C. § 1915(a), (b)).

[¶39]   The hierarchy "is predicated upon the perceived notion of degree of permanence of the placement. Reunification with [a parent or parents] is deemed the most secure, adoption is the next most secure, followed by guardianship, relative placement and 'another planned permanent living arrangement' which are deemed less secure in that order." *Jaseven*, 2013 WL 1223856, at \*3. While the Wyoming legislature has not codified the hierarchy, the order of preference has been incorporated in DFS policy, which requires DFS to pursue adoption when reunification is not possible and authorizes guardianship only when both reunification and adoption are not in the best interests of the child.[13]

[¶40]   Indeed, children are "afforded the best possible opportunity to get on with the task of growing up [when they are placed] in the most permanent and secure alternative that can be afforded them." *In re Beatrice M.*, 35 Cal. Rptr. 2d 162 (Ct. App. 1994). "[C]hildren have a right to stability and permanency in their family relationships." *Matter of Adoption of MAJB*, 2020 WY 157, ¶ 24, 478 P.3d 196, 204 (Wyo. 2020) (quoting *In re A.D.*, 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109 (Wyo. 2007)). "[L]ong-term stability is critical to a child's future health and development." *In re Davonta V.*, 940 A.2d 733, 739 (Conn. 2008). Adoption provides finality and long-term stability to children. *See, e.g.*, *In re D.B.*, 615 N.E.2d 1336, 1340 (Ill. App. Ct. 1993).

---

[13] The manual states:

> The Department shall pursue adoption for children for whom reunification is not possible or not in the child's best interest. Adoption provides children with permanent homes with relative or non-relative adoptive parents.
>
> .   .   .
>
> The Department shall not pursue legal guardianship until reasonable efforts have been exhausted to reunite the child with their family and the Department has documented why adoption is not in the best interest of the child.

Wyoming Department of Family Services, Protective and Juvenile Services Manual, Ch. 3, policy 3.2 & 3.3, https://dfs.wyo.gov/about/policy-manuals/protective-and-juvenile-services-manual-2/ (last visited Jan. 31, 2022).

[¶41]   Guardianship, in contrast, provides less stability.  Guardianships can be terminated for a variety of reasons.  Wyo. Stat. Ann. § 3-3-1101(a) (listing circumstances under which guardianships can terminate).  A petition to terminate a guardianship may be filed every six months.  Wyo. Stat. Ann. § 3-3-1105.  Nevertheless, guardianship can be a permanency option under the right circumstances.  *See generally* Wyo. Stat. Ann. §§ 14-3-431(c), (d), & (k), 14-3-440.

[¶42]   Here, Ms. Handley testified that adoption as the permanency plan was in the best interests of SMD and SND because it would give them long-term stability and a permanent home.  *Supra* ¶ 20.  She explained that both children thrived in a stable environment that provided routine and consistency.  *Supra* ¶ 20.  Mother and Father agreed that the plan should change from reunification.  Both preferred a permanency plan of guardianship, not because it was in the best interests of the children, but to give them more time to address their issues and leave open the possibility that they could reunite as a family at some future point.[14]   *Supra* ¶¶ 23–24.   The juvenile court thoughtfully considered adoption and guardianship options.  It ultimately determined that adoption was in SMD's and SND's best interests because of the stability it offered.  *Supra* ¶ 36.  This determination, given the record before this Court, was within the juvenile court's discretion.

## II.   *Did the juvenile court abuse its discretion when it determined there was no need for a concurrent plan of reunification when it determined DFS could cease reunification efforts?*

[¶43]   Mother asserts two arguments regarding the juvenile court's determination that reunification efforts were no longer required.  First, she argues that the juvenile court's decision to not adopt a concurrent plan of reunification, or to otherwise order continued reasonable efforts, was not supported by sufficient evidence.  Second, she contends that the juvenile court erred as a matter of law by failing to make findings under Wyo. Stat. Ann. § 14-2-309(b) & (c).  We address both arguments.

## A.   Sufficiency of the Evidence

[¶44]   "[W]hile the decision to change a permanency plan must be supported by sufficient evidence, the same is not true for the decision to discontinue reasonable efforts following a change in plan."  *AM*, ¶ 10, 497 P.3d at 918.  "To change a permanency plan, the juvenile court must determine whether the current plan is in the child's best interests and whether DFS has made reasonable efforts to finalize the plan."  *SW*, ¶ 17, 491 P.3d at 269 (citations omitted).  DFS must prove a change in the permanency plan is justified by a preponderance of the evidence.  *KC*, ¶ 25, 351 P.3d at 243.  If the court finds that DFS has met its burden and the child's best interests require something other than family reunification, it will

---

[14] Guardianship is not an alternative route to reunification for parents who have not been able to comply with their case plan.

change the permanency plan accordingly. *Id.* "[R]eunification efforts inconsistent with the permanency plan may be discontinued." *AM*, ¶ 11, 497 P.3d at 918 (quoting *In re NDP*, 2009 WY 73, ¶ 21, 208 P.3d 614, 619 (Wyo. 2009)); *see AM*, ¶ 11, 497 P.3d at 918 ("If reasonable efforts to reunify are 'determined to be inconsistent with the permanency plan for the child,' efforts shall be made in accordance with the revised permanency plan 'to finalize the permanent placement of the child.'" (quoting Wyo. Stat. Ann. § 14-3-440(d))).

[¶45] Here, the juvenile court determined that DFS' reasonable efforts to reunify the family had failed and that reunification was no longer in the best interests of the children. The permanency plan was changed to adoption. As we explained, the decision to change the permanency plan was within the juvenile court's discretion. *Supra* ¶¶ 36–42. After a trial court makes this determination, reunification efforts are no longer necessary because the plan no longer aims to reunify the family. *See AM*, ¶ 12, 497 P.3d at 919 (citing cases). The juvenile court did not abuse its discretion when it determined reunification was no longer in the children's best interests and ordered reasonable efforts could cease.

## B.    Applicability of Wyo. Stat. Ann. § 14-2-309(b) & (c)

[¶46] Mother also contends that the juvenile court order allowing DFS to cease reunification efforts was "insufficient as a matter of law" because the juvenile court made no findings under Wyo. Stat. Ann. § 14-2-309(b) & (c).[15] We addressed this same argument in *AM*, where we explained:

---

[15] Wyo. Stat. Ann. § 14-2-309 provides:

> (a)    The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
>
>> (i)    The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications. For purposes of this paragraph, a court order of custody shall not preclude a finding that a child has been left in the care of another person;
>> (ii)    The child has been abandoned with no means of identification for at least three (3) months and efforts to locate the parent have been unsuccessful;
>> (iii)    The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

(iv)     The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child;

(v)     The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child;

(vi)     The child is abandoned at less than one (1) year of age and has been abandoned for at least six (6) months;

(vii)     The child was relinquished to a safe haven provider in accordance with W.S. 14-11-101 through 14-11-109, and neither parent has affirmatively sought the return of the child within three (3) months from the date of relinquishment;

(viii)     The parent is convicted of murder or homicide of the other parent of the child under W.S. 6-2-101 through 6-2-104;

(ix)     The parent committed sexual assault and the child was conceived as a result of the sexual assault. For the purposes of this paragraph, the following shall apply:

(A)     A person committed sexual assault if the person was convicted of an offense under W.S. 6-2-302, 6-2-303, 6-2-314 through 6-2-316 or other similar law of another jurisdiction;

(B)     Reasonable effort to reunify the family is not required to terminate parental rights;

(C)     This paragraph shall not apply if the parent seeking termination was married to or cohabiting with the parent committing the sexual assault resulting in the birth of the child for not less than two (2) years immediately after the birth of the child. Nothing in this subparagraph shall be construed as limiting a parent from seeking termination under another provision of this section or from seeking sole custody under title 20, chapter 5 of the Wyoming statutes.

(b)     Proof by clear and convincing evidence that the parent has been convicted of any of the following crimes may constitute grounds that the parent is unfit to have custody or control of any child and may be grounds for terminating the parent-child relationship as to any child with no requirement that reasonable efforts be made to reunify the family:

(i)     Murder or voluntary manslaughter of another child of the parent or aiding and abetting, attempting, conspiring to commit or soliciting such a crime; or

(ii)     Commission of a felony assault which results in serious bodily injury to a child of the parent. As used in this paragraph "serious bodily injury" means as defined by W.S. 6-1-104.

(c)     Notwithstanding any other provision of this section, evidence that reasonable efforts have been made to preserve and reunify the family is not required in any case in which the court determines any one (1) or more of the following by clear and convincing evidence:

16

Wyoming statute § 14-2-309 addresses the grounds for terminating the parent-child relationship. Subsection (a) sets forth bases for termination that generally require DFS to make reasonable efforts at reunification prior to seeking termination. Subsections (b) and (c) address circumstances in which the parents' conduct is so egregious that the statute specifically states no reasonable efforts are required before DFS seeks termination.

*AM*, ¶ 14, 497 P.3d at 919.

[¶47]  Generally, DFS must make reasonable efforts to preserve and reunify the family to either eliminate the need to remove the child from the family home, or to make it possible for the child to safely return home. Wyo. Stat. Ann. § 14-3-440(a); *KC*, ¶¶ 20–31, 351 P.3d at 242–45. "If DFS considers the reasonable efforts have not achieved those goals, it may seek to change the permanency plan from reunification to adoption, as it did here, and it must then 'demonstrate to the juvenile court that it made reasonable efforts to reunify the family but was unsuccessful.'" *AM*, ¶ 15, 497 P.3d at 920 (quoting *VS*, ¶ 38, 429 P.3d at 25). Mother bases her argument here on the provisions of § 14-2-309(b) and (c) which dispel DFS obligations to preserve or reunify the family from the inception of a case. Her reliance is misplaced. These provisions apply to exceptional circumstances not at issue here, such as murder of another child or sexual abuse. *See AM*, ¶ 15, 497 P.3d at 920.

---

(i)      The parental rights of the parent to any other child have been terminated involuntarily;
(ii)     The parent abandoned, chronically abused, tortured or sexually abused the child;
(iii)    The parent has been convicted of committing one (1) or more of the following crimes against the child or another child of that parent:
    (A)     Sexual assault under W.S. 6-2-302 through 6-2-304;
    (B)     Sexual battery under W.S. 6-2-313;
    (C)     Sexual abuse of a minor under W.S. 6-2-314 through 6-2-317.
(iv)     The parent is required to register as a sex offender pursuant to W.S. 7-19-302 if the offense involved the child or another child of that parent. This shall not apply if the parent is only required to register for conviction under W.S. 6-2-201;
(v)      Other aggravating circumstances exist indicating that there is little likelihood that services to the family will result in successful reunification.

Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2021).

[¶48]   The juvenile court found that DFS had made reasonable efforts to reunify the family, but those efforts were unsuccessful.  The juvenile court did not err when, after it ordered a permanency plan of adoption, it concluded that continued reasonable efforts were inconsistent with the new plan and could cease.  Neither Wyo. Stat. Ann. § 14-2-309(b) or (c) is applicable to this case.

## *CONCLUSION*

[¶49]   The juvenile court did not abuse its discretion when it found that it was in the children's best interests to change the permanency plan to adoption instead of guardianship.  The juvenile court did not abuse its discretion when it determined DFS could cease reunification efforts.