# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 28

OCTOBER TERM, A.D. 2024

March 17, 2025

IN THE INTEREST OF: LH, minor child,

TH,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-24-0214

*Appeal from the District Court of Park County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*

Rives T. White and Sanford Ballou, Student Intern, of Cowboy Legal, LLC, Cody, Wyoming.

*Representing Appellee:*

Bridget Hill, Attorney General; Christina F. McCabe, Deputy Attorney General; Wendy S. Ross, Senior Assistant Attorney General; Callie R. Papoulas, Senior Assistant Attorney General.

*Guardian ad Litem:*

Joseph R. Belcher, Director, and Kim Skoutary Johnson of the Wyoming Office of the Guardian ad Litem.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]     TH (Mother) appeals from the juvenile court's order changing the permanency plan from reunification to adoption after the minor child (LH) had been in the State's custody for approximately 18 months.  Mother claims the juvenile court failed to consider the minor child's relationship with his sibling, who remained in Mother's custody, when it changed the permanency plan.  She also argues the juvenile court abused its discretion when it changed the permanency plan to adoption when she had maintained sobriety for six months.  We affirm.

## ISSUES

[¶2]     Mother presents two issues on appeal, which we frame as follows:

> 1.  Did the juvenile court abuse its discretion by omitting in its permanency order any reference to LH's relationship with his sibling, RH, and the potential of separating siblings?
>
> 2.  Did the juvenile court abuse its discretion when it found it was in LH's best interest to change the permanency plan to adoption?

## FACTS

[¶3]     Mother has two children, LH, born in 2022, and RH, born in 2021, who share the same biological father.  When LH was born, Mother tested positive for opiates.  LH also tested positive for opiates.  Law enforcement took LH into protective custody shortly after his birth and placed him in the care of the State of Wyoming, Department of Family Services (Department).

[¶4]     On September 26, 2022, the State filed a petition against Mother alleging neglect of LH.  The Department did not take protective custody of RH or request the State to file a neglect petition against Mother relating to RH.  The juvenile court held a shelter care hearing and placed LH in the Department's legal and physical custody, with physical placement of LH to be with his great-grandmother in relative foster care.  The juvenile court advised Mother if LH "is in foster care for fifteen (15) out of the most recent twenty (22) months, the State may move to terminate parental rights."  The juvenile court also ordered Mother not to use or consume controlled substances and to submit to drug testing.

[¶5]     In November 2022, Mother was residing in a camper on the great-grandmother's property.  LH resided in great-grandmother's home.  RH also resided with LH in the great-grandmother's home, though Mother had legal and physical custody of RH.  While living in the camper on the same property as her minor children, Mother tested positive for

1

methamphetamine. The State filed a request for emergency placement review. The juvenile court held a hearing on November 7, 2022, and suspended all visitation between LH and Mother until Mother provided at least one clean urinalysis (UA). Mother also stipulated to moving off the great-grandmother's property. She moved the camper to a different location in town, but she had RH continue to live with the great-grandmother.

[¶6] In December 2022, Mother admitted to the allegations in the neglect petition, and the juvenile court adjudged Mother to have neglected LH. The juvenile court ordered LH to remain in the legal and physical custody of the Department with physical placement to be in relative foster care with his great-grandmother. The juvenile court further ordered Mother to "have clean UAs by January 2, 2023, or she shall be put into inpatient treatment by her counselor[.]"

[¶7] The juvenile court held its six-month review and dispositional hearing in February 2023. Mother continued to test positive for methamphetamine, so the juvenile court ordered Mother to "complete inpatient treatment and complete all outpatient and aftercare required or recommendations of the treatment program." She was further ordered to "only have supervised visitation with [LH] if she is sober."

[¶8] Mother entered inpatient treatment on March 13, 2023, and she was discharged on May 26, 2023. Mother was treated for severe methamphetamine use disorder and severe amphetamine-type substance use disorder. Upon discharge, the treatment center recommended Mother attend counseling and at least two to four AA/NA meetings per week; continue her spiritual development; and obtain and meet regularly with a female sponsor. Shortly after completing inpatient treatment, Mother began testing positive for opiates. The Department suspended Mother's visitation with LH because of her continued use of illegal substances.

[¶9] By August 2023, Mother started to have clean UAs. In September, the juvenile court held its 12-month permanency hearing. At the hearing, the Department recommended continuing with the case plan of reunification and revisiting that plan in three months because Mother started testing negative for illegal substances. The juvenile court ordered the permanency plan to remain reunification but adopted a concurrent plan of adoption should reunification be unsuccessful. The juvenile court also ordered Mother to "maintain her sobriety[.]"

[¶10] The following month, Mother admitted to relapsing and failing to maintain her sobriety. Mother also tested positive for opiates while visiting with both LH and RH. During this incident, a Department employee text messaged Mother asking Mother to provide a UA. Mother responded she was in Billings, Montana. The employee went to the great-grandmother's home and found Mother at the home with LH and RH during a time she was not scheduled to have visitation with LH. The Department required Mother to take a UA, and her test was confirmed positive for opiates. Because Mother tested

2

positive, her visits with LH were once again suspended until she could produce a clean UA.

[¶11]   After testing positive, Mother admitted she needed to engage in her treatment.  She met with her counselor and filled out an application for low-income apartments.  She applied for jobs and obtained employment in February 2024.  Mother began a medically assisted treatment (MAT) program.  As part of the MAT program, Mother took suboxone and met with her medical provider and counselor to obtain sobriety.

[¶12]   In January 2024, the Department filed its quarterly progress report and changed its recommendation from reunification to adoption.  The Department documented Mother's progress on the case plan as follows:

> [Mother] has been in non-compliance with her sobriety case plan goal from the start of the case in September of 2022 until August of 2023.  She did have a relapse in October which was significant because she had used and went to the foster home during a non-visitation time.  She had also lied about her location to this worker.  [Mother] has yet to establish a financial way to support [LH] as well as her other child in her custody.

The Department documented Father refused to comply or be a part of the case plan.  It further discussed the great-grandmother had complied with the case plan.

[¶13]   In March 2024, the Department filed its permanency report for the permanency hearing scheduled approximately 18 months after LH was taken into protective custody.  The Department noted in its report it was concerned because Mother used an illegal substance and visited with LH after she had completed inpatient treatment and months of counseling.  The Department noted Mother's barriers towards achieving reunification were: (1) continued use of controlled substances, which limited her ability to see LH; (2) unwillingness to attend in-person substance abuse groups; (3) unwillingness to find employment or suitable housing; and (4) limited parenting skills.  The Department noted in its report that Mother has custody of RH, but RH resides with the great-grandmother where LH is currently residing.

[¶14]   The juvenile court held a permanency and review hearing on March 20, 2024.  At the conclusion of the permanency hearing, the juvenile court found it was in LH's best interest to change the permanency plan to adoption to provide him with stability.  The juvenile court noted absent certain exceptions, Wyoming Statute § 14-3-431(m) mandates the Department to "file a petition to terminate parental rights" "[w]hen a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months[.]"  At the time of the hearing, LH had been in the Department's

custody for approximately 18 months. The juvenile court also found Mother did not comply with the case plan or court orders, and she failed to maintain sobriety after completing inpatient treatment. It further found Mother failed to progress to unsupervised or overnight visitation with LH because of her lack of progress on the case plan. Regarding father, the juvenile court found he refused to participate in the matter. The court issued its written order, finding reunification efforts had been unsuccessful, and it was in the best interest of LH to change the permanency plan to adoption. Mother timely appealed from the permanency order.

## STANDARD OF REVIEW

[¶15] We review a juvenile court's order changing a permanency plan for an abuse of discretion. *In re SK*, 2024 WY 25, ¶¶ 21–22, 544 P.3d 606, 613 (Wyo. 2024). "To change a permanency plan 'from family reunification to adoption, a juvenile court must find that the Department made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest.'" *In re MA*, 2022 WY 29, ¶ 25, 505 P.3d 179, 185 (Wyo. 2022) (quoting *In re RR*, 2021 WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021)). "A court abuses its discretion if 'it acts in a manner which exceeds the bounds of reason under the circumstances.'" *In re SK*, ¶ 22, 544 P.3d at 613 (quoting *In re SRS*, 2023 WY 50, ¶ 21, 529 P.3d 1074, 1080 (Wyo. 2023)). "To the extent Mother challenges the sufficiency of the evidence [supporting] the juvenile court's decision, 'we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.'" *In re AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021) (quoting *In re JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 180 (Wyo. 2021)). We measure the juvenile court's decision to change the permanency plan "against the preponderance of the evidence standard." *In re SK*, ¶ 23, 544 P.3d at 613–14 (quoting *In re DT*, 2017 WY 36, ¶ 30, 391 P.3d 1136, 1145 (Wyo. 2017)); *In re AM*, 2021 WY 119, ¶ 11, 497 P.3d at 918 ("The State must prove that a change in the permanency plan is justified by a preponderance of the evidence. If the juvenile court determines the State has met its burden, it may order a change in the permanency plan.). "We review the proper application and interpretation of the Child Protection Act de novo." *In re PT*, 2025 WY 11, ¶ 12, 562 P.3d 848, 851 (Wyo. 2025) (citing *In re JN*, 2023 WY 83, ¶ 9, 534 P.3d 455, 457–58 (Wyo. 2023)).

## DISCUSSION

[¶16] Mother argues the district court abused its discretion by changing the permanency plan from family reunification to adoption. She claims the juvenile court failed to consider LH's relationship with his sibling, RH, when it changed its permanency plan. She also argues the juvenile court abused its discretion when it changed the permanency plan to adoption because she had been sober for several months and provided more than 50 clean UAs.

*I. The juvenile court did not abuse its discretion by omitting any reference to LH's relationship with his sibling and the possibility of separating the siblings when it changed the permanency plan to adoption.*

[¶17]  The juvenile court is required to conduct a review hearing every six months to inquire into the health and safety of the child, the continued need for the out-of-home placement, the appropriateness of the current placement, the adequacy of the Department's efforts to reunify the family, the appropriateness of the case plan, and the extent of the parent's compliance with the case plan. Wyo. Stat. Ann. § 14-3-431(c) (LexisNexis 2023); *In re GC*, 2015 WY 73, ¶ 23, 351 P.3d 236, 243 (Wyo. 2015).  In addition to the six-month review hearing, the juvenile court must "conduct a permanency hearing no later than twelve (12) months from the date of the child's removal from the home[.]" Wyo. Stat. Ann. § 14-3-431(d); *In re GC*, ¶ 24, 351 P.3d at 243.  The juvenile court may combine the review hearing and the permanency hearing if the "hearing is held within twelve (12) months from the date of the child's removal from the home." Wyo. Stat. Ann. § 14-3-431(h).  At a permanency hearing, the juvenile court must "[d]etermine whether the permanency plan is in the best interest of the child and whether the [Department] has made reasonable efforts to finalize the plan[.]" Wyo. Stat. Ann. § 14-3-431(k)(i).  If the juvenile court finds "the child's best interests require something other than family reunification, it will change the permanency plan accordingly." *In re GC*, ¶ 25, 351 P.3d at 243.

[¶18]  Mother claims the juvenile court abused its discretion by changing the permanency plan to adoption without considering any evidence of sibling separation when making its best interest determination.  She contends the juvenile court failed to address how it weighed the separation of siblings before changing the permanency plan.

[¶19]  Wyoming's Child Protection Act provides little specific guidance about what evidence the juvenile court should consider when determining what permanency plan is in the child's best interests "or the process that is due to the child or the parents at a permanency hearing." *Id.* at ¶ 24, 351 P.3d at 243.  The statute does require the Department to present certain information:

> [T]he [Department] shall present to the court: [e]fforts made to [e]ffectuate the permanency plan for the child, address the options for the child's permanent placement, examine the reasons for excluding other permanency options and set forth the proposed plan to carry out the placement decision, including specific times for achieving the permanency plan[.]

Wyo. Stat. Ann. § 14-3-431(j)(i)(A).

[¶20]  Because the statute is silent about whether the juvenile court needs to consider sibling separation, Mother suggests we should look to our statutory authority and case law

for civil child custody disputes to determine what the juvenile court is required to consider under the Child Protection Act. She relies on our holding in *Noonan v. Noonan*, 2005 WY 145, 122 P.3d 964 (Wyo. 2005). In *Noonan*, the district court entered a default judgment splitting the custody of two siblings between parents without hearing any evidence or making any findings regarding the specific statutory factors or the rule regarding the separation of siblings. 2005 WY 145, ¶¶ 3, 10–12, 122 P.3d at 965–67. We vacated the default judgment and reiterated in child custody matters the district court must place on the record its reasoned explanation for any custody decision involving the separation of siblings to ensure a comprehensive evaluation of all the relevant factors before awarding custody. *Id.* at ¶¶ 10, 12, 122 P.3d at 966–67 (citations omitted).

[¶21] We reiterated this holding in *Ianelli v. Camino*, 2019 WY 67, ¶ 30, 444 P.3d 61, 69 (Wyo. 2019). In *Ianelli*, we found the district court abused its discretion by failing to address in its findings of fact and conclusions of law the separation of siblings and other material factors when it changed physical custody from mother to father. *Id.* at ¶¶ 30–37, 444 P.3d at 69–70. We acknowledged there is "a strong public policy in favor of preserving sibling relationships and 'keeping siblings together in the same household'" "equally applicable whether the children are full sibling, half sibling, or stepsiblings." *Id.* at ¶ 30, 444 P.3d at 69 (quoting *Paden v. Paden*, 2017 WY 118, ¶ 19, 403 P.3d 135, 141 (Wyo. 2017); *Aragon v. Aragon*, 2005 WY 5, ¶ 26, 104 P.3d 756, 764 (Wyo. 2005)). Our rule requiring the district court to set forth a reasoned explanation for separating siblings in civil custody disputes exists

> because close familial relationships are much to be encouraged, brothers and sisters need each other's strengths and association in those everyday and often common experiences; separating them unnecessarily is likely to be traumatic and harmful. In addition, brothers and sisters may particularly need each other's support to cope with the strain of their parents' divorce.

*Noonan*, 2005 WY 145, ¶ 10, 122 P.3d at 966 (quoting *Aragon v. Aragon*, 2005 WY 5, ¶ 26, 104 P.3d at 764).

[¶22] We decline to adopt our civil custody case law on separating siblings. The Wyoming Legislature has not specified any best interest factors for the juvenile court to consider when determining the best interests of a child under the Child Protection Act. Although sibling separation and sibling relationships may be a factor for the juvenile court to consider, it is not an abuse of discretion in this case for the juvenile court to have omitted any reference to LH's relationship with his sibling or any possibility of a sibling separation when it changed the permanency plan. *See In re PT*, 2025 WY 11, ¶¶ 13–17, 562 P.3d at 851–52 (finding the juvenile court did not abuse its discretion when it did not explicitly list all the reasonable efforts made by the Department).

6

[¶23] We do note the separation of siblings and the impact on the minor child in the Department's custody is a factor for the juvenile court to consider throughout all stages of the proceedings involving the child's placement and permanency. As we noted in *Noonan*, separating siblings is likely to be traumatic and harmful, and siblings need each other's association, so placements and adoptions should encourage those relationships continue whenever possible. 2005 WY 145, ¶ 10, 122 P.3d at 966 (quoting *Aragon*, 2005 WY 5, ¶ 26, 104 P.3d at 764). However, we recognize each case is unique, so the juvenile court cannot consider the sibling relationship in isolation. Absent any statutory mandate on what a juvenile court is required to consider, a juvenile court considers a sibling relationship along with all factors relevant to the unique circumstances of each child in the Department's custody when it determines what permanency plan or placement is in the best interest of the minor child. *See generally In re BN*, 2022 WY 146, ¶ 31, 520 P.3d 529, 536 (Wyo. 2022) (discussing when reviewing whether the Department made reasonable efforts, we cannot consider mental health issues in isolation but instead must consider them in the context of each unique circumstance).

[¶24] Here, the record shows the juvenile court had before it ample evidence of LH's relationship with his sister and their current living situation, along with the possibility it may have to separate LH from his sibling. The juvenile court had evidence before it showing Mother had two children, LH and RH, and both children shared the same father. The monthly multi-disciplinary reports (MDT) detailed the Department's efforts to preserve LH's family connections, including stating LH resided "with maternal relatives and sister." The May 2023 MDT report mentioned the Department did not have jurisdiction over RH. The MDT report filed approximately eight months before the March 2024 permanency hearing stated the Department was "looking at other foster-adopt homes and a transition if [Mother] cannot gain and maintain sobriety[.]" The Department stated looking into adoption "has been a difficult discussion as [the Department] knows this will split siblings—[LH] and [RH] will be separated as this court does not have jurisdiction over [RH]." The permanency report filed with the juvenile court in September 2023 states: "[Mother] continues to have custody of her other daughter. This child resides with [Mother's] grandparents where [LH] is currently residing." Additionally, the October 2023 MDT report reiterated RH is not a part of the case and the Department "has no legal control over what happens to [RH.]"

[¶25] The State and Mother's counsel presented evidence at the permanency hearing about LH's and RH's relationship and the issue of separating the siblings. The Department caseworker testified about RH and stated LH and RH have resided together with the great-grandmother since the beginning of the case. The caseworker also testified the Department never took protective custody of RH, and Mother still had custody of RH. Mother's counsel further questioned the caseworker about the Department's position on separating the siblings:

[Mother's Counsel]: [RH] is not part of this proceeding, right?

[Department Caseworker]: She is not part of this case, no.

[Mother's Counsel]: . . . Does DFS have any position on essentially splitting siblings up when one child is part of a proceeding and one child is not?

[Department Caseworker]: So I've never -- I've not dealt with this in that one child is part of the proceeding and another child is not. That is not something I've experienced. I mean, normally DFS, we attempt to keep siblings together in foster homes, you know, with parents and such. Sometimes different parents end up taking children in that way as they have separate, like, biological mothers or such.
So that's something, but I usually -- yes, we attempt to keep siblings together. However, with [RH] not being a part of this case, we offer services for [RH], we try to help out, but she's not part of it, so I don't have complete -- I don't have a say in her situation completely. But, I mean, it is something we have thought about and considered.

\* \* \*

[Mother's Counsel]: Why didn't DFS list [RH] as a child at that point as part of the case? Why was it only [LH]?

[Department Caseworker]: I'm not familiar with how that process went with the County Attorney's Office. That is the agency that makes that decision. We always plan around children, so I know that that was a conversation . . . for [RH], but I don't -- I wasn't a part of those initial conversations.

Additionally, the court appointed special advocate's (CASA) report, which was filed for the juvenile court's consideration at the permanency hearing, stated the CASA was concerned "about the children potentially being separated in placement." The report also discussed "LH and his sister [were] receiving excellent care by the foster parents" and "appear happy, safe and healthy while thriving in their great grandparents' home."

[¶26]  Although the juvenile court's order is silent about how it weighed this evidence, the record shows the juvenile court was aware of LH's relationship with his sister and the current living situation where his sister also resided in the great-grandmother's home. It also knew that changing the permanency plan could result in separating the siblings.

Weighing this evidence and all the other evidence presented at the hearing, the juvenile court found it was in LH's best interest to change the permanency plan to adoption. The juvenile court also ordered "continued placement in foster care with [the great-grandmother]," which allowed the siblings to maintain their relationship and living situation as the case progressed forward. We cannot find the district court abused its discretion by omitting any reference to how it weighed LH's relationship with his sibling or the separation of siblings in its order changing the permanency plan to adoption. *In re PT*, 2025 WY 11, ¶¶ 13–17, 562 P.3d at 851–52.

## II. The district court did not abuse its discretion when it changed the permanency plan to adoption.

[¶27] In her final argument, Mother challenges the juvenile court's decision to change the permanency plan from family reunification to adoption. Mother argues the juvenile court abused its discretion when it changed the permanency plan because she made meaningful progress on her case plan and maintained sobriety for eight months, as indicated by more than 50 clean UAs.

[¶28] Our caselaw is clear: "[e]ven when progress has been made during some point of a case plan, a juvenile court does not abuse its discretion when sufficient progress is not made within a reasonable time." *In re JN,* 2024 WY 105, ¶ 27, 556 P.3d 748, 756 (Wyo. 2024) (quoting *In re SRS*, 2023 WY 50, ¶ 25, 529 P.3d at 1081). "Children have a right to stability and permanency in their family relationships." *In re SRS*, ¶ 30, 529 P.3d at 1082 (quoting *In re JPL*, 2021 WY 94, ¶ 62, 493 P.3d 174, 186 (Wyo. 2021)). The Child Protection Act recognizes the children's right to stability and permanency is superior to the parent's right to familial association by placing a time limit on the amount of time a child stays in foster care while the parent attempts to rehabilitate. *In re SRS*, ¶ 30, 529 P.3d at 1082; Wyo. Stat. Ann. § 14-3-431(m) ("When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights[.]").

[¶29] Here, Mother failed to make sufficient progress on her case plan goals, specifically on her sobriety and obtaining a safe and stable living environment within the time frame designated by statute. Mother's case plan goals from the beginning were to obtain sobriety, complete a parenting class, obtain a safe and stable living environment, complete recommended inpatient treatment and aftercare, and obtain employment. Throughout the case Mother struggled with substance abuse, including testing positive for illegal substances while in the presence of her minor children. Due to Mother's continued drug use, she was not able to have consistent or unsupervised visitation with LH. Mother never provided care for LH on a full-time basis during any point since his birth. She did not obtain employment until shortly before the permanency hearing. She failed to demonstrate she could financially support and provide suitable housing for LH.

[¶30] At the time of the permanency hearing, LH had been in the State's custody for approximately 18 months. Shortly after LH was taken into protective custody, Mother tested positive for methamphetamine while living in a camper on the great-grandmother's property. At the six-month review hearing, the juvenile court found Mother continued to use illegal drugs and ordered her to "successfully complete inpatient treatment and complete all outpatient and aftercare required or recommendations of the treatment program." Mother entered inpatient treatment, and when she was discharged, the treatment facility recommended Mother attend "counseling and at least two to four (2-4) AA/NA meetings per week; continue her spiritual development; obtain and meet regularly with a female sponsor." The caseworker testified Mother failed to attend the NA/AA weekly meetings, but she did attend counseling. Despite completing inpatient treatment and counseling, Mother was unable to stay sober, and she continued to test positive for illegal substances.

[¶31] A year after LH was taken into custody, Mother was informed the Department was approaching 15 months with LH in its custody, and if she did not make any serious efforts, the Department would recommend adoption. Despite knowing the Department was going to change its recommendation to adoption if she had any further positive UAs, Mother continued to test positive for illegal substances and had unauthorized visitation. Two UA tests confirmed Mother was around her children while under the influence of an illegal substance.

[¶32] Although Mother admitted to the relapse and started a medically assisted treatment program to obtain sobriety, she still had not obtained a safe and stable living environment for LH. Mother did not obtain any employment until February 2024, a year after she was ordered to obtain employment and immediately before the permanency hearing. She testified the great-grandmother financially supported her and her minor children. Mother continued to reside in a camper that she admitted was an unsuitable living situation for her minor children. Mother also had her daughter, RH, residing with the great-grandmother.

[¶33] Viewing the evidence in the light most favorable to the State, the juvenile court did not abuse its discretion by changing the permanency plan from family reunification to adoption. Although Mother made some progress shortly before the permanency hearing, there was sufficient evidence for the juvenile court to determine it was in LH's best interest to change the permanency plan to adoption. *See In re JN*, 2024 WY 105, ¶¶ 25–27, 556 P.3d at 756 (finding the juvenile court did not abuse its discretion in changing the permanency plan to adoption when Mother failed to make sufficient progress on the goals of her case plan, in particular, her sobriety).

## CONCLUSION

[¶34] The juvenile court received evidence about the potential separation of LH from his sibling if the court changed the permanency plan to adoption. The juvenile court did not

abuse its discretion by declining to articulate how it weighed this evidence when it changed the permanency plan from reunification to adoption. The juvenile court did not abuse its discretion when it changed the permanency plan from reunification to adoption and allowed the Department to cease reunification efforts. Affirmed.