# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 47

### APRIL TERM, A.D. 2026

### April 23, 2026

IN THE INTEREST OF: AG, minor
child,

AR,

Appellant
(Respondent),

v.                                                          S-25-0201

THE STATE OF WYOMING,

Appellee
(Petitioner).

---

*Appeal from the District Court of Natrona County*
The Honorable Joshua C. Eames, Judge

*Representing Appellant:*
  Timothy C. Cotton, Cotton Legal, Casper, Wyoming.

*Representing Appellee:*
  Keith G. Kautz, Wyoming Attorney General; Christina F. McCabe, Deputy
  Attorney General; Wendy S. Ross, Senior Assistant Attorney General; Margaret F.
  Laing, Assistant Attorney General.

**Representing Guardian Ad Litem:**
  Joseph R. Belcher, Director; Kimberly Skoutary Johnson, Chief Trial and Appellate
  Counsel; Wyoming Office of the Guardian ad Litem.

*Before BOOMGAARDEN, C.J., GRAY, FENN, JAROSH, and HILL, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    AR (Father) appeals the juvenile court's order changing the permanency plan for his daughter, AG, from family reunification to adoption. Father argues the juvenile court abused its discretion when it found adoption was in AG's best interests, and that the court instead should have permitted him to continue his efforts to achieve reunification. Finding no abuse of discretion, we affirm.

## ISSUE

[¶2]    Father raises a single issue, which we rephrase as:

> Did the district court abuse its discretion when it found the State proved by a preponderance of the evidence that it was in AG's best interest to change the permanency plan from reunification to adoption?

## FACTS

[¶3]    AG was born on June 29, 2024, and tested positive for methamphetamine at birth. Twelve hours after giving birth, Mother left AG in the hospital and did not return for almost twenty-four hours. During that absence, AG showed withdrawal symptoms consistent with exposure to methamphetamine. Mother stayed for one hour before leaving again. She did not return.

[¶4]    Because Mother refused to care for AG, and because of AG's exposure to methamphetamine, medical professionals took protective custody of AG on July 1, 2024. At that time, Mother provided the Department of Family Services (Department) with Father's name as an alleged Father. He was incarcerated at the Natrona County Detention Center at that time, and believed he was AG's father. He also indicated he wanted to be in AG's life if he was her father but did not want to start visitation until paternity was established.

[¶5]    On July 3, 2024, the Natrona County District Attorney filed a neglect petition alleging Mother neglected AG. Mother failed to appear at the initial hearing, and the court entered a default judgment against Mother and adjudicated AG as a neglected child. The juvenile court placed AG in the Department's legal and physical custody for placement and ordered paternity testing for Father and AG.

[¶6]    While paternity testing was pending, the Department met with Father to create a predisposition report and an initial case plan, although reunification services did not begin immediately. The predisposition report included information on Mother's previous interactions with the Department as well as Father's childhood involvement with the

1

Department, his mental health issues, his history of substance abuse, and his criminal history.

[¶7]    On August 29, 2024, the juvenile court held a disposition hearing.  The court ordered AG to remain in the Department's custody and ordered the permanency plan to be reunification upon successful completion of a Family Service Plan (case plan).   The Department agreed it would develop a formal case plan tailored to Father's needs *if* he was AG's father.  In October 2024, genetic testing confirmed Father's paternity of AG, and an official order legally establishing paternity followed on December 27, 2024.  In November 2024, the Department moved forward with a case plan that included various components related to Father.

[¶8]    Given this appeal is Father's alone,[1] we will focus only on the components of the case plan related to him.   Those components were mental health, sobriety, stability, parenting, and requirements related to his ongoing criminal matters (e.g., keeping the Department up to date on sentencing and release dates).  Father's case plan development stemmed from his history of mental health issues, substance abuse and addiction, and the fact that Father was incarcerated at that time and faced time in prison.[2]  Father reported that before his incarceration he was homeless "for a while."  He also reported lacking a strong support system and that as a child he was in and out of six foster homes and institutions since the age of six.

[¶9]    Father's case plan steps were as follows:  complete an Addiction Severity Index and attend recommended treatment; complete an alcohol and drug intake within forty-eight hours of his release and provide random urinalysis (UAs) thereafter; work with the Department to find counseling while incarcerated and follow any recommendations and complete any classes deemed appropriate; find stable and appropriate housing after his release; attend all AG's appointments when appropriate; complete any recommended parenting classes; abstain from criminal activity; and notify the Department of all updates regarding his criminal proceedings.

[¶10]  Because of Father's incarceration and potential length of sentence, the Department considered the case plan steps ongoing, with no completion dates assigned.   AG, meanwhile, continued to receive foster care services.  Father provided the Department with two potential guardianship placements for AG — the mother of his other children, who declined, and a former babysitter of Father's who lived in Texas.  The babysitter asked to be a last resort and believed removing AG from her foster parents in Wyoming would be "borderline cruel."

---

[1] Mother did not appeal.

[2] Father became incarcerated for felony charges while on probation for other charges.  His probation was revoked for obtaining the new charges, and he was sentenced to two and half to three and a half years for those revocations.  He faced trial for felony assault which was reduced to a misdemeanor.

2

[¶11]  In November 2024, with Father still incarcerated, the multi-disciplinary team met and issued a non-unanimous recommendation of permanency through reunification; two members of the team favored a permanency plan of adoption.  In December 2024, the juvenile court held a six-month review hearing, after which it issued an order that AG remain in the Department's legal and physical custody.  In the order, the court found that the Department's plan for reunification was appropriate, but noted Father had not made any significant progress toward alleviating or mitigating the causes necessitating foster care placement.

[¶12]  The Department completed a quarterly progress review report in early February 2025.  Father remained incarcerated.  The Department explained that in light of Father's criminal history and incarceration, Father could not provide permanency for AG until she was at least two years old.  The Department noted AG needed a stable, long-term home.  As a result, the Department requested a concurrent plan of adoption.

[¶13]  In February 2025, the multi-disciplinary team met again and recommended a permanency plan of reunification with a concurrent plan of adoption.  After a review hearing a few days later, the juvenile court added a concurrent permanency plan of adoption to the primary plan of reunification.  In May 2025, Father transferred to the Newcastle Honor Conservation Camp Intensive Treatment Unit.  Father estimated he would be eligible for parole in December 2025 upon successful completion of that program.  He also requested a permanency hearing with the juvenile court after the May 2025 multidisciplinary team meeting resulted in a split recommendation for permanency, with the majority recommending adoption and the minority recommending reunification.  According to the multi-disciplinary team, if there was going to be reunification:

> Once released from incarceration, the Department would like to see the safety plan in place and working consistently for 2-3 [months] to show sobriety before moving to unsupervised visits, another 2-3 months to progress to trial home placement, then would like to monitor that for 4-6 months before closing this case, which would put the timelines at around 12-18 months after [Father's] release.

[¶14]  At the permanency hearing, the Department's caseworker Stacy Walworth testified about the Department's timeline and efforts to reunify Father with AG.  Because Father had been incarcerated the entire case, Ms. Walworth testified he was unable to complete much of his case plan due to his incarceration.  First, she mentioned that proving sobriety was difficult because it was "forced" while Father remained incarcerated.  She also testified that stability and parenting goals were also problematic to assess while a person is incarcerated.  The counseling component of a case plan was also difficult to provide due to a lack of services, and in Father's case, the particular kind of counseling he requested was unavailable.  The only component of Father's case plan that was meaningfully

3

accomplished while he was incarcerated was visitations with AG, and those occurred via video.

[¶15] Ms. Walworth testified that once Father's incarceration ended, he would be "starting fresh" with his case plan. At that time, Father's release date was unknown, but as of October 1, 2025, Father's earliest possible release date, the case would have been open for almost fifteen months. However, upon Father's release, Ms. Walworth stated AG would not be immediately placed with Father because Father would need to prove sobriety and stability before moving to the next steps.

[¶16] According to Ms. Walworth, the Department typically works a case plan four to six months before returning or placing a child back with a parent. During that time, the Department facilitates supervised visitations, helps to prove sobriety, and then moves to a trial home placement. At the time of the permanency hearing, Father and AG had only met in person twice in AG's lifetime.

[¶17] Ms. Walworth testified the Department recommended adoption for AG in large part due to her age and her bond with her foster placements.[3] Ms. Walworth also indicated AG "deserve[d]" to have a permanent plan in place sooner rather than later. Additionally, the Department exhausted all efforts to place AG in a guardianship with family or kin. Ms. Walworth also explained that the Department ruled out guardianship because it would not have been in AG's best interests. She explained that within the permanency hierarchy, the Department prefers the most permanent option, which is reunification with the parent. Adoption is next, followed by guardianship. Ms. Walworth explained guardianship was not an ideal option for AG, mostly due to her age, but also because the Department had not identified a suitable guardian for AG.

[¶18] Father also testified at the permanency hearing. He confirmed the length and timeline of his incarceration and disagreed with the permanency plan on adoption. He also testified about his efforts while incarcerated to complete his treatment plan and work through his case plan. He asked the court to extend the case past the fifteen of the most recent twenty-two months requirement so he could either work a case plan or find a guardianship placement.

[¶19] At the hearing's conclusion, the juvenile court ruled the Department had made reasonable efforts at reunification and that it was in AG's best interest to change the permanency plan to adoption. In so ruling, the court first pointed out that Father was incarcerated at the inception of AG's neglect case. The court emphasized that regardless of whether paternity was established at AG's birth in July 2024, or when it was proven in October 2024 and legally established in December 2024, the main difference would have

---

[3] After AG's initial foster placement, on April 1, 2025, she was placed in another home that better aligned with the permanency goal of reunification, kinship placement, or adoption.

been more video visits between Father and AG during that time. The court noted the quality and effect of those video visits would have been "more impactful" on Father than on AG due to her age.

[¶20]  The court went on to recognize that Father would remain incarcerated until at least September 2025, and maybe even until December 2025, or beyond. Only after that would Father be given an opportunity to accomplish the primary components of his case plan — sobriety and stability — in order for reunification to be achieved. The court pointed out Father would not be available to make those efforts sooner because he was incarcerated due to his own decisions. All things considered, the court calculated that waiting for Father to achieve and prove sobriety and stability would mean, in the "best case scenario," AG would not achieve permanency until she was almost two years old. The court determined "this is not timely permanency for a child." And while Father was compliant with the components of his case plan that he could work on while incarcerated, that did not comport with AG's best interest.

[¶21]  Father timely appealed.

## STANDARD OF REVIEW

[¶22]  We review a juvenile court's order changing a permanency plan for an abuse of discretion. *In re DC,* 2026 WY 3, ¶ 12, 562 P.3d 1127, 1132 (Wyo. 2026) (citing *in re LH,* 2025 WY 28, ¶ 15, 565 P.3d 683, 687 (Wyo. 2025)) (citation omitted). *"*A court abuses its discretion if it acts in a manner which exceeds the bounds of reason under the circumstances." *Id.* "To change a permanency plan from family reunification to adoption, a juvenile court must find that the Department made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest." *Id.* (citation modified).

[¶23]  "In evaluating the sufficiency of the evidence in a neglect proceeding, we measure the juvenile court's decision against the preponderance of the evidence standard." *In re JN,* 2024 WY 105, ¶ 24, 556 P.3d 748, 755 (Wyo. 2024) (quoting *Int. of SK*, 2024 WY 25, ¶¶ 21-23, 544 P.3d 606, 613-14 (Wyo. 2024)). We examine the evidence in the light most favorable to the prevailing party, assuming all favorable evidence to be true while disregarding conflicting evidence presented by the unsuccessful party. *Int. of JN,* ¶ 24, 556 P.3d at 755-76 (quotation omitted). "We give considerable deference to the juvenile court." *In re DC,* ¶ 12, 562 P.3d at 1132 (citation omitted).

## DISCUSSION

[¶24]  Father contends the record does not contain sufficient evidence that adoption is in AG's best interest and thus the juvenile court erred when it ordered a change in the permanency plan from reunification to adoption. He also argues he was compliant with

the case plan as much as possible given his incarceration, and AG suffered no adverse effects during the reunification process although Father was incarcerated. Father does not challenge whether the Department made reasonable efforts at reunification.

[¶25] To change a permanency plan, "the State must prove by a preponderance of the evidence that the current plan is not in the child's best interests[.]" *Interest of SRS,* 2023 WY 50, ¶ 22, 529 P.3d 1074, 1080 (Wyo. 2023) (quotation omitted). The juvenile court is tasked with determining the child's best interests. *See* Wyo. Stat. Ann. § 14-3-431(k)(i) (2025). Children have a right to stability and permanency in their family relationships. *Interest of SRS,* ¶ 30, 529 P.3d at 1082 (quoting *Matter of JPL,* 2021 WY 94, ¶ 62, 493 P.3d 174, 186 (Wyo. 2021)) (quotation omitted). There must be limits on the amount of time [the Department] will attempt to rehabilitate a parent while the children remain in foster care. *Interest of SRS,* ¶ 30, 529 P.3d at 1082. These time limits highlight that a child's right to stability and permanency is even superior to the parent's right to familial association. *Id.* "Children do not have the luxury of time; '[a]t some point, the rights and needs of the children rise above the rights and needs of the parents.'" *Int. of SMD*, 2022 WY 24, ¶ 35, 503 P.3d 644, 654 (Wyo. 2022) (quoting *Int. of SW*, 2021 WY 81, ¶¶ 27–28, 491 P.3d 264, 271–72 (Wyo. 2021)). Indeed, "when the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *See Int. of DC,* ¶ 15, 581 P.3d at 1133. While incarceration alone does not automatically justify altering a permanency plan, it is a factor the juvenile court may consider when evaluating a parent's ability to provide care within a reasonable amount of time. *Id.,* ¶ 23, 581 P.3d at 1135.

[¶26] In *DC,* this Court affirmed a juvenile court's decision to change a child's permanency plan from reunification to adoption after the father made minimal progress toward achieving stability for the child while he was incarcerated. *Id.*, ¶¶ 23-25, 581 P.3d at 1135-36. There we noted any limitations the Department faces while dealing with an incarcerated parent is attributable "not to the Department, but to the parents' criminal behavior and subsequent incarceration." *Int. of DC,* ¶ 19, 581 P.3d at 1134 (citing *Int. of BP*, 2022 WY 128, ¶ 25, 518 P.3d 698, 704–05 (Wyo. 2022) (citation modified); *see also In re S.S.G.,* 2014 MT 26N, ¶ 6 (Mont. 2014) (unreported) (finding no abuse of discretion in termination of Father's parental rights because "[Father] faced extended incarceration for a violent felony, the child was very young and needed immediate permanency, and the child had been in state custody for 21 months of her 22 month life."). The court's focus must remain on the child's need for stability and permanency which are of the utmost importance. *See SP v. State*, 2025 WY 101, ¶ 33, 576 P.3d 603, 614 (Wyo. 2025) ("A child's permanency and stability are of the utmost importance…"). "Parents are not afforded an indefinite period to achieve their case plan goals." *Int. of SRS,* ¶ 25, 529 P.3d at 1081 (citation modified).

[¶27] Although Father complied with portions of his case plan while incarcerated, that compliance alone did not align with AG's best interests. The district court concluded that delaying permanency would be contrary to AG's needs, emphasizing the importance of

time and stability in its analysis. The district court stated, "While [Father] is compliant with the components of his case plan that he can be compliant with while incarcerated, that does not control the issue of what is in [AG's] best interest." It went on:

> As in many juvenile cases, one of the most important considerations is time. […] It is undisputed that we are at 11 months and there has been no proven, or ability to prove, sobriety and stability in the community so that reunification can be successful. Rather, the best case scenario is [Father] is released in late September, which would be 14 months in, and then, at best, eight months before he can demonstrate the necessary sobriety and stability upon a consistent level with DFS' reasonable efforts before reunification is possible.
>
> This best case scenario is, however, contingent on [Father] successfully completing ITU by September, the parole board granting 80 days of special good time, the parole board granting parole at [Father's] earliest opportunity if the first two contingencies materialize, the parole grant being to the street and no completion of an ACC, which would require another approximately six months in addition to the approximately eight months once released to the streets.
>
> This best case scenario means [AG] could have permanency by the time she is almost two years old. If these multiple contingencies do not fall in place, that [Father] is looking at release in December of this year, which taking into account the uncertainty if [Father] will be granted parole in December, and the uncertainty on what his parole grant will look like, would add another four months before reunification and thus permanency could be established.
>
> Even in the best case scenario, this is not timely permanency for a child.

[¶28] The record supports the juvenile court's decision. At the time of the permanency hearing, AG had spent her entire life in foster care. Undeniably, Father faced certain limitations because he was incarcerated. The record shows Father participated in available programs and accomplished what he could while he was so limited. However, the juvenile court's focus was not exclusive to Father's incarceration. Rather, the court's primary focus was AG, and the amount of time she had already spent in uncertainty while waiting for Father to become capable of providing her with proper care. The court reasonably concluded that waiting an indeterminate period for Father to be released, establish stability, demonstrate sustained sobriety, secure stable housing and employment, and develop parenting capacity would only prolong uncertainty in AG's life.

7

[¶29]  In *SP*, we weighed the importance of a parent's opportunity to address through competency evaluations the issues that led to the children's removal against their need for permanency and stability.  *SP*, ¶ 23, 576 P.3d at 611.  We reiterated a child's permanency and stability are of the utmost importance, and that the child should not be denied stability while waiting for the parent to address the issues that may well have led to the child's removal.  *Id.,* ¶ 33, 576 P.3d at 614.  The rights of the child to a stable future with a loving family must be paramount; otherwise, the child's development may be compromised for the sake of the parent.  *Id.,* ¶ 33, 576 P.3d at 614-15.  Although competency is different from incarceration, the underlying concern is the same: the passage of time and the child's need for permanency.

[¶30]  Finally, Father argues because there are no specific statutory "best interest factors" governing permanency determinations (as in custody proceedings), the juvenile court lacked a framework for making a best interest determination.  This argument is unpersuasive.  The Wyoming Child Protection Act consistently places the child's safety, permanency, and well-being at the center of a court's decision making.  *Interest of SO,* 2016 WY 99, ¶ 10, 382 P.3d 51, 53-54 (Wyo. 2016) (finding at its core, a juvenile court's decision under the Child Protection Act regarding placement of a child must be based on the child's best interests).  Permanency determinations necessarily require the juvenile court to evaluate a child's best interests when deciding whether to continue reunification efforts or change a permanency goal to adoption.  *Int. of BG,* 2023 WY 40, ¶ 18, 528 P.3d 402, 409 (Wyo. 2023).  In doing so, the court must assess whether reunification can be achieved within a reasonable time and whether continuing that effort serves the child's need for stability and permanency, which is inherently a best interests analysis.  *See In re NDP,* 2009 WY 73, ¶ 31, 208 P.3d 614, 621 (Wyo. 2009).

[¶31]  Here, the juvenile court considered Father's circumstances and personal history, including the length of his incarceration, the limited relationship between father and child, AG's age, and AG's need for permanency.  The court also considered that Father could not demonstrate compliance with significant components of his case plan — sobriety and stability — until after he is released from prison, and that this was the result of Father's own choices leading to his incarceration.  After weighing these factors, the court concluded Father could not assume parental responsibilities within a timeframe consistent with AG's needs for permanency.  These findings provided a sufficient basis for the court's conclusion that adoption, not reunification, was in AG's best interests.  *See Int. of SMD,* ¶ 40, 503 P.3d at 656 (stating "[a]doption provides finality and long-term stability to children, and "long term stability is critical to a child's future health and development.") (citations omitted).[4]

---

[4] Although guardianship was considered by the Department, it concluded that given AG's age, and emotional and developmental needs, adoption offered the only permanency solution consistent with AG's best interests and thus guardianship was not formally pursued by the Department.  The juvenile court also similarly concluded in its findings guardianship was not in AG's best interests.  The court reasoned guardianship was not a viable option because "it is not permanent" and "would leave [AG] in a state of

8

The juvenile court's decision is supported by sufficient evidence and, as such, the court did not abuse its discretion in determining it was in AG's best interests to change the permanency plan to adoption.

## CONCLUSION

[¶32]   The juvenile court did not abuse its discretion when it determined that changing the permanency plan from reunification to adoption was in AG's best interests.  Because Father has not shown the court abused its discretion, we affirm.

---

permanent impermanency[.]"  *See also, Int. of SMD*, ¶ 41, 503 P.3d at 656 ("Guardianship, in contrast [to adoption], provides less stability.").