# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 50

APRIL TERM, A.D. 2023

May 25, 2023

IN THE INTEREST OF: SRS and LS,
minor children,

JS,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

IN THE INTEREST OF: SRS and LS,
minor children,

DS,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-22-0215, S-22-0216

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant JS:*
     *Brittany Thorpe, Domonkos & Thorpe, LLC, Cheyenne, Wyoming.*

*Representing Appellant DS:*
     *Donald E. Miller, Miller Law Firm, Cheyenne, Wyoming.*

*Representing Appellee:*
*Bridget Hill, Attorney General; Christina McCabe, Deputy Attorney General; Callie Papoulas, Assistant Attorney General. Argument by Ms. Papoulas.*

*Guardian ad Litem:*
*Deborah L. Roden, Woodhouse Roden Ames & Brennan, LLC, Cheyenne, Wyoming.*

***Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    In these consolidated appeals, Father and Mother challenge the juvenile court's decision to change the permanency plan for their children SRS and LS from family reunification to adoption. In Appeal No. S-22-0216, Father argues there was insufficient evidence to support the permanency plan change to adoption, and that it was not in the best interest of SRS and LS due to their individual high needs. In Appeal No. S-22-0215, Mother asserts there was insufficient evidence to change the permanency plan based on contradicted hearsay statements. We affirm.

## ISSUE

[¶2]    Both parents' issues on appeal can be distilled to:

> 1.    Did the juvenile court abuse its discretion when it changed the permanency plan to adoption?

## FACTS

[¶3]    The State filed a Petition Alleging Neglect against Father and Mother on October 30, 2020. The Affidavit for Probable Cause, submitted with the Petition, alleged that the Cheyenne Police Department responded to calls at Father and Mother's home on October 28 and October 29. The first call was for a welfare check after a school bus driver dropped off SRS at the home, but she was unable to enter because it was locked, and no one would answer the door. Officers arrived at the home and looked through an open window to see Father and Mother asleep inside. It took officers several minutes of yelling through the open window to wake them. Once they entered the house, officers discovered a foul odor, bugs, and trash strewn throughout the house, and observed that exterior doors were padlocked from the inside, locking LS and his maternal grandmother inside the house with no exit.[1]

[¶4]    The second call came from Mother at 4:15 a.m. the following morning to report SRS as missing. The responding officer learned that Mother allowed SRS to spend the night at a friend's home without coordinating the stay with the other child's mother or confirming SRS had arrived, even though the temperature that night was around thirty degrees. Because of Mother's ongoing failure to tend to the needs of her children, the officer determined that SRS and LS should be taken into protective custody. The juvenile court decided it was contrary to the children's welfare to remain in the home and granted the State legal custody of the children with a permanency plan of family reunification.

---

[1] Grandmother had recently suffered a stroke that left her immobile and unable to assist SRS or the officers.

1

[¶5]    A Multidisciplinary Team (MDT) was formed and filed its first report in December 2020. SRS and LS were originally put in non-relative foster care, but SRS was moved to a facility to better address her mental health needs and to undergo psychological evaluations. SRS was thirteen years old at the time, with significant mental health needs, and a history of running away from home and falsely reporting crimes. LS was almost six years old and previously diagnosed with autism. Before being placed in foster care, LS was nonverbal, in diapers, and still drinking from a bottle.

[¶6]    DFS developed a case plan in December that outlined several objectives Father and Mother needed to achieve to regain custody of their children. The objectives included family and individual therapy; a psychological evaluation for Mother; securing and maintaining a clean and safe living environment for the children; demonstrating they could provide for their children's physical, medical, and emotional needs; and properly supervising their children at all times. While the children were in DFS custody, Father and Mother were allowed supervised, in-person visits with LS and supervised video or phone call visits with SRS. Father and Mother were informed that, if SRS and LS remained in DFS custody for fifteen of the most recent twenty-two months, DFS could file a petition to terminate parental rights.

[¶7]    DFS filed a quarterly progress review report in January 2021. The report stated LS showed substantial improvement in foster care; the highly structured environment was beneficial, he was potty trained, he expanded his vocabulary, and was able to follow a schedule and directives. SRS, however, struggled in her placement. She ran away on multiple occasions, made false accusations against staff members, and struggled with her mental health. Eventually, she was moved to the Juvenile Detention Center due to her higher needs and safety concerns.

[¶8]    Father and Mother made some progress on the case plan. They removed the padlocks on the doors and replaced them with door alarms. They both began therapy but missed several sessions, which hindered their progress. Father was more willing to engage in therapy than Mother. Mother believed therapy was unnecessary and that showing up but not participating was enough to satisfy her case plan. During visits with LS, Father was engaged with LS and often played on the floor with him. Mother did not do this but rather showed LS videos on her phone or bought him gifts. Extra supervision was required for visitation with SRS as Mother engaged in inappropriate conversations with her which may have contributed to SRS' escalated behaviors. Mother completed her psychological evaluation which advised she engage in intensive dialectical behavior therapy treatment, social skills group, family therapy, parenting courses, and consistent drug testing. The progress report recommended the permanency goal remain family reunification.

2

[¶9]   A second MDT Report was filed in March 2021. It noted that both SRS and LS were doing well and improving. Father and Mother, however, had recently been evicted from their home, although through no fault of theirs. Mother had been dropped by her therapist because of too many missed appointments, but Father was given the option to continue. Father and Mother were frequently late to supervised visits with LS and they continued to show troubling patterns of neglect and lacked follow-through on case plans. The MDT recommended legal and physical custody remain with the State. The quarterly progress report filed in April echoed the MDT Report.

[¶10]  The juvenile court held a six-month review hearing in April 2021 and considered the MDT and DFS case reports. The court found no progress had been made in alleviating the causes that required the children to be placed in State custody. It found that returning the children home at that time would be contrary to the welfare and best interest of the children. The permanency plan remained family reunification.

[¶11]  A second case plan was created in June 2021 with additional goals. The plan listed Mother's goals as: continue to work on stabilizing her mental health and her familial relationships; attend all therapy sessions and be open and honest in those sessions; take all medication prescribed; maintain one therapy provider for a six-month period; arrive at all individual and family therapy sessions on time; and ensure she can adequately provide for SRS and LS' physical, mental, and emotional needs. Father was given similar goals and an additional goal of continuing to develop family intervention and self-advocating techniques.

[¶12]  The quarterly progress report filed in July 2021 stated Father and Mother had made some progress towards their goals but had several setbacks. Father and Mother attended therapy but missed several appointments with their new provider and Mother was eventually discharged as a client because of her absences. Mother completed a psychological evaluation while still in therapy but did not complete a required Psychological Assessment of Parental Capacity. DFS was providing transportation to facilitate visits through a DFS aide; however, Mother began contacting the aide in the middle of the night and on her personal cellphone. Therefore, the aide refused to work with the family. Father and Mother were evicted twice, once for failure to pay rent. They informed DFS they obtained employment but were unable or unwilling to submit proof of employment. The permanency goal remained family reunification.

[¶13]  The September quarterly progress report described signs of regression by Father and Mother. Mother continued to miss or be late to "theraplay" sessions with LS and did not engage or provide physical or emotional support for LS during sessions. Mother failed to complete her Psychological Assessment of Parental Capacity and misled DFS about completing a sufficient assessment. Father and Mother were unable to provide housing information after their most recent eviction. Mother had been calling the Cathedral Home, where SRS had been transferred after completing her time at Wyoming

3

Girl's School (WGS), alleging the Cathedral Home was torturing SRS, threatening her safety, and that Mother had video proof of it. Mother also called the police to conduct a welfare check on SRS at Cathedral Home. Father and Mother missed or were excessively late to several visits with SRS. They returned late with SRS from the visit they did attend because of Mother's insistence they stay out an extra hour. Father and Mother also had immense difficulty following scheduling and transportation guidelines for visits with LS, often failing to show or to pick up LS despite consistent communication by DFS. Father and Mother allegedly secured an RV to live in, but they did not provide DFS with any information confirming it. The report continued to recommend family reunification but recommended a concurrent plan of adoption.

[¶14] DFS again updated the case plan in January 2022, with the permanency plan remaining family reunification with a concurrent plan of adoption. The plan outlined similar goals as the previous plan, including individual and family therapy, providing appropriate care and support to LS and SRS, and continuing to improve Father and Mother's mental health. It added requirements that Mother engage in drug testing and Father obtain a driver's license and actively seek employment. The plan also gave Father and Mother three months to complete 80% of the case plan, and if they failed to do so, warned that DFS may request a change of permanency plan to adoption.

[¶15] Another MDT Report was filed in March 2022. It stated Father failed to pass his driver's license test, was frequently late to therapy appointments, and had regressed in implementing the skills learned in therapy to voice his own opinions and help Mother control her emotions. Mother's family therapy sessions at Cathedral Home were discontinued in February because she became argumentative and disruptive with SRS. Mother missed numerous drug tests but tested negative on all tests she completed. Father and Mother missed several visits with LS, leading to visits being canceled. Law enforcement was called to Father and Mother's RV where they found chemicals in the toilet, jars of feces and urine throughout the RV, no plumbing, running water, or heat, and an open gas flame stove with oxygen tanks in the vicinity. Law enforcement reported if LS and SRS had been present, they would have been taken into protective custody. The ongoing concerns of mental health, consistency, scheduling, communicating, household instability, and overall safety led DFS to recommend the permanency plan be changed to adoption. The quarterly report reflected these concerns. The MDT Report recommended a permanency plan change to adoption.

[¶16] The juvenile court held an evidentiary permanency hearing on April 22, 2022. The court heard testimony from the DFS primary case worker, a clinical psychologist who evaluated Mother, a DFS social services supervisor, Father, and Mother. The caseworker testified that Father and Mother were missing medication appointments which created significant mental health concerns. She testified that Mother and SRS' relationship was strained, there was an unhealthy parenting dynamic, and that SRS said she lacked a connection with Mother. The case worker described Father's progress as "hit or miss"

and there was no documentation to support any progress Mother claimed to have made. The caseworker distinguished between Father and Mother, testifying that if Father were the only parent in the home, family reunification may be accomplishable. But Father and Mother had no plans to separate and DFS could not feasibly make separate permanency plan recommendations. If the children were reunified with one parent, they would undoubtedly be reunified with both.[2] Based on the totality of the circumstances the case worker was unable to estimate how long it would take to achieve family reunification and she recommended the permanency plan change to adoption.

[¶17] A psychologist who conducted an evaluation of Father and Mother testified that family reunification would be an "uphill battle," but not an impossibility. Mother would require extensive time, instruction, and practice to learn proper parenting skills to meet her children's needs. Father was motivated and capable of improving to the point that would allow for family reunification. However, Mother engaged in somewhat delusional thinking and showed signs of paranoia which Father was unable or unwilling to counter. Mother also asserted to the psychologist that there were no issues with her parenting or lifestyle, and she did not need help; rather the issue was with DFS and its misrepresentations of the situation.

[¶18] A social services supervisor testified to her experience with the family throughout the case plan and a separate proceeding with SRS. She testified that working with Mother was difficult and inconsistent. The supervisor was informed on the day of the hearing that another therapy provider had dropped Mother due to missed appointments. She further testified Mother had been dropped by numerous visitation, therapeutic, and medical providers because of missed appointments. Mother's relationship with SRS was strained and tumultuous. Mother called Cathedral Home and made threats and other inappropriate comments which led to Mother being barred from the premises. SRS did not want to do family counseling with Mother but had a great relationship with Father and would happily do family counseling with just him. The supervisor did not believe it was in SRS' best interest to return home.

[¶19] Father and Mother both testified and expressed their love for and desire to have their children back in their custody. Father testified he was unsure if he was ready for LS to come back home because of the work the RV needed. He also testified SRS had previously told him she did not want to return home because of Mother. Mother testified that they were moving the RV to a place with utilities, and she was also going to look at several houses. She also reported to DFS that they had secured an apartment but did not provide DFS any documentation to confirm this.

---

[2] DFS never suggested or took the position that Father and Mother should or were required to separate to regain custody of their children.

[¶20] Upon hearing testimony and reviewing case plans and reports, the court found DFS made reasonable efforts to reunify the family and because Father and Mother made little to no progress, it was in the best interests of the children to change the permanency plan to adoption. Father and Mother had a long history of issues with ample time to resolve them, but they consistently failed to do so and had not shown this instance to be any different. The court determined that despite immense help from DFS, Father and Mother failed to provide a safe living environment for the children; both parents failed to pursue employment; they failed to consistently attend or engage in counseling; and although Father had improved, his relationship with Mother would unavoidably cause both children to be reunified with Mother, which was adverse to LS and SRS' best interests. The court highlighted the substantial strides LS and SRS made in their respective environments. LS was using the bathroom, drinking from a glass, and had become much more verbal during his placement with his foster family. SRS made immense progress in her mental and emotional health during her time at WGS and Cathedral Home. The juvenile court relieved DFS of its efforts to reunify the family.

## STANDARD OF REVIEW

[¶21] "We review a juvenile court's change in permanency plan for abuse of discretion." *Interest of SMD*, 2022 WY 24, ¶ 27, 503 P.3d 644, 652 (Wyo. 2022) (citing *Interest of GC*, 2015 WY 73, ¶ 18, 351 P.3d 236, 242 (Wyo. 2015)). A court abuses its discretion if "it acts in a manner which exceeds the bounds of reason under the circumstances." *Id.* (quoting *Interest of AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021)). When sufficiency of the evidence is challenged, we view the evidence in the light most favorable to the prevailing party, giving every reasonable inference to the prevailing party below, assuming all evidence favorable to the prevailing party is true, and discounting any conflicting evidence brought by the unsuccessful party. *Id.* (quoting *Interest of AM*, 2021 WY 119, ¶ 9, 497 P.3d at 918).

## DISCUSSION

[¶22] Father and Mother bring distinct issues and their arguments will be analyzed separately. "To change a permanency plan, the juvenile court must determine whether the current plan is in the child's best interests and whether DFS has made reasonable efforts to finalize the plan." *Interest of AM*, 2021 WY 119, ¶ 11, 497 P.3d at 918 (quoting *Interest of SW*, 2021 WY 81, ¶ 17, 491 P.3d 264, 269 (Wyo. 2021)). Throughout the plan, "the child's health and safety shall be the paramount concern." Wyo. Stat. Ann. § 14-3-440(b) (2021). To change the permanency plan, "the State must prove by a preponderance of the evidence that the current plan is not in the child's best interests and that DFS has made reasonable, but unsuccessful, efforts to finalize the plan." *Interest of BP*, 2022 WY 128, ¶ 17, 518 P.3d 698, 702 (Wyo. 2022) (citing Wyo. Stat. Ann. § 14-3-431(k)(i)). If the court determines the burden was met, "it may order a change in the

6

permanency plan." *Id.* at ¶ 17, 518 P.3d at 703 (quoting *Interest of AM*, 2021 WY 119, ¶ 11, 497 P.3d at 918).

### I.    *The juvenile court did not abuse its discretion when changing the permanency plan to adoption.*

### A.    Father

[¶23]  Father's challenge to the permanency plan change contains two arguments: whether there was sufficient evidence to change the permanency plan change to adoption and whether that change was in the best interests of the children. Both are reviewed for abuse of discretion. *Interest of SMD*, 2022 WY 24, ¶ 27, 503 P.3d at 652 (citing *Interest of GC*, 2015 WY 73, ¶ 18, 351 P.3d at 242).

[¶24]  Father argues that he made substantial progress in his case plan, he simply needed more time to complete it, and the permanency plan should not have been changed. Father argues he has a great relationship with LS and SRS, engaged and behaved appropriately with LS during visits, and made progress in therapy. Father also had unsupervised visits with LS and improved in addressing situations where Mother acted inappropriately.

[¶25]  By many accounts, Father was improving and progressing early in the case plan. Parents are not afforded an indefinite period to achieve their case plan goals, however. *See Interest of GC*, 2015 WY 73, ¶ 38, 351 P.3d at 246; Wyo. Stat. Ann. § 14-2-309(a)(v) (2021). Even when progress has been made during some point of a case plan, a juvenile court does not abuse its discretion in a case such as this when sufficient progress is not made within a reasonable time. *Matter of JPL*, 2021 WY 94, ¶ 63, 493 P.3d 174, 186 (Wyo. 2021). LS and SRS were first taken into custody in October 2020 and the juvenile court changed the permanency plan to adoption in April 2022. The State had legal custody of the children for eighteen consecutive months and many of Father's case objectives were not completed during that time. In the last MDT Report, as the potential of the permanency plan changing to adoption became closer to reality, Father began to regress. He did not obtain his driver's license; missed several visits with LS; and failed to secure adequate housing for his children, instead he lived in an RV with no heat, plumbing, or running water.

[¶26]  As the juvenile court noted, being poor is not a disqualification to parenthood; however, Father failed to make adequate strides, as outlined in his case plan, to demonstrate he could provide for his children's financial needs. *See id.* at ¶¶ 51-52, 61, 493 P.3d at 184, 186 (requiring parents to attempt to provide financial stability for their children). Father eventually found part-time work but consistently failed to meet plan goals requiring him to search for full-time work, to work with Wyoming Workforce Services to find work, and to send out five job applications per week. By the March 23

MDT Report, DFS had only received confirmation of one job application. Father failed to pursue full-time work even with DFS' best efforts to assist, which directly affected his ability to provide a safe and stable home for his children.

[¶27] Father's mental health progress was "hit or miss." Although Father made progress on the surface, he missed several therapy sessions and medication appointments, and missed or arrived late to family visitation sessions, affecting his overall progress. Father also missed three months of domestic violence victim advocate sessions from June to September 2021, and again failed to attend these sessions beginning in February 2022.

[¶28] In *Interest of SMD*, both parents made some progress early in the case plan, then regressed until, after two years, little progress had been made. 2022 WY 24, ¶ 35, 503 P.3d at 654. The parents struggled with mental health, housing, and employment, and asked for more time to comply with their case plan. *Id.* The juvenile court determined that because little progress was made over the course of the plan, the permanency plan should be changed to adoption, and we affirmed. *Id.* at 654, 658.

[¶29] Here, Father had ample time to make progress on his case plan yet substantial progress still needed to be made after eighteen months of assistance. Father regressed as the case plan prolonged even though he was aware the permanency plan could change to adoption. The record supports the finding that Father made little progress, and the juvenile court did not abuse its discretion by declining to give Father more time.

[¶30] Additionally, Father's argument that the juvenile court abused its discretion because adoption was not in the best interest of his high-needs children fails. Father argues it was in SRS and LS' best interest to continue the permanency plan of family reunification for an unspecified period of time because he was making progress in his case plan and parental custody was a better solution for his children than adoption. The juvenile court, however, disagreed, finding that both children made substantial progress while in DFS custody. LS was no longer wearing a diaper or drinking from a bottle, he was receiving help for his autism disorder, and he had become much more verbal. SRS made substantial strides in her mental and emotional health and made excellent grades at Cathedral Home, all of which were commended by the juvenile court. Continuing to leave the children in a state of uncertainty while Father and Mother attempted to make progress on their case plans would negatively affect their progress:

> [C]hildren have a right to stability and permanency in their family relationships. Section 14-2-309(a) recognizes there must be limits on the amount of time [the Department] will attempt to rehabilitate a parent while the children remain in foster care. The time limits recognize that the children's right to stability and permanency is superior to the parent's right to familial association.

*Matter of JPL*, 2021 WY 94, ¶ 62, 493 P.3d at 186 (quoting *In re A.D.*, 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109-10 (Wyo. 2007)). "When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *Id.* (quoting *SD v. Carbon Cnty. Dep't of Fam. Servs.*, 2002 WY 168, ¶ 27, 57 P.3d 1235, 1241 (Wyo. 2002)).

[¶31] LS benefited from a highly structured environment with clear and consistent discipline, a defined schedule, and direction. He made immense strides with his foster family and Father could not provide the same structured environment. LS' improvement in foster care and Father's lack of improvement supports the finding that adoption is in LS' best interest.

[¶32] Similarly, SRS returning home would create a high risk of regression due to Mother's emotional instability and Father's lack of progress in responding properly to Mother's emotions, regardless of Father's positive relationship with SRS. Such an environment had negative effects on SRS and led to many of her disciplinary issues. The record supports the finding that it was in SRS' best interest not to return to an emotionally unstable environment.

[¶33] Father failed to provide a safe place for his children to live, directly endangering their health and safety, which is of paramount importance in permanency plan proceedings. Wyo. Stat. Ann. § 14-3-440(b). Cheyenne Police were called to Father's RV and found unsafe living conditions to the degree that SRS and LS would have been taken into protective custody. Father failed to offer any proof he acquired a safer home for his children or that he took any steps to remedy the hazardous living space. The record thus supports the finding that returning SRS and LS to such a living environment would not be in their best interest.

[¶34] The State proved by a preponderance of the evidence that adoption was in the children's best interest and therefore, the juvenile court did not abuse its discretion in changing the permanency plan to adoption. Father was given ample time to make progress on his case plan but failed to alleviate many of the major concerns that led to his children's placement in protective custody. Additionally, SRS and LS improved substantially while in DFS' protective custody. The juvenile court's decision did not exceed the bounds of reason under the circumstances and therefore it did not abuse its discretion in ordering the permanency plan change to adoption.

**B.      Mother**

[¶35] Mother argues the juvenile court abused its discretion because there was insufficient evidence to change the permanency plan to adoption.[3] Mother's argument stems from SRS' statement to the juvenile court that she wanted to return home to her parents so they could be a family despite the difficulties they faced up to that point. SRS' testimony conflicted with DFS' testimony and Father's testimony that SRS had expressed her desire not to do family therapy with Mother and her concern that being back with Mother would cause her to regress and "restart the cycle that she's already been in for the past few years."[4]

[¶36] Viewing all the evidence in the light most favorable to the State, we must determine whether the juvenile court could reasonably have found that it was in SRS' best interest to change the permanency plan to adoption. The juvenile court gave serious consideration to SRS' wishes but determined that Father and Mother did not make adequate, if any, progress in their case plans, and returning SRS and LS home would not be in the children's best interest.

[¶37] Mother consistently failed to attend therapy and counseling, and when she did attend, she stated she did not need counseling and did not participate. She was dropped by multiple providers because of missed appointments, inappropriate behavior, and aggression. Mother saw no issue with her parenting or behavior and instead blamed DFS for misrepresenting the family's situation. She engaged in delusional thinking and believed several agencies were conspiring against her to take her children away. Her failure to see her conduct could be improved was troubling and conflicted with the original goal of family reunification.

[¶38]  DFS provided evidence that Mother was not taking her medication which hindered her mental health progress. She failed to secure adequate and safe housing for her children, she made little to no progress in improving her mental and emotional health, and she often acted inappropriately with SRS specifically, and did not adequately engage with LS during "theraplay" sessions.

[¶39] Mother engaged in family therapy with SRS at Cathedral Home but quickly became argumentative and disruptive with SRS and accused SRS' therapist of brainwashing her. When Mother was given an opportunity to visit with SRS while SRS was at Cathedral Home, Mother persuaded SRS and Father to return late, contrary to

---

[3] Mother's brief stated the issue was whether the juvenile court abused its discretion by relying on contradicted hearsay testimony in its decision to change the permanency plan. At oral argument, Mother abandoned this argument, instead arguing the issue above.

[4] The juvenile court recognized SRS' testimony conflicted with DFS' testimony and made a credibility determination when concluding it was in SRS' best interest to change the permanency plan to adoption.

instructions. Cathedral Home terminated family therapy with Mother because of these issues and eventually barred her from the property for making threats and other inappropriate contact with Cathedral Home.

[¶40]  The evidence showed Mother was also unable to meet LS' physical and emotional needs. Mother's inability to regulate her own emotions had an impact on LS and often caused significant escalations. Mother struggled with scheduling and promptness with visits with LS. Mother was late picking up and dropping off LS, which disrupted his routine, and she consistently missed or failed to confirm visits. Mother attempted to intrude on Father's supervised visitation with LS and was warned this behavior was inappropriate and unacceptable. Eventually, these supervised visits were terminated due to Mother's behavior and lack of progress.

[¶41]  Like Father, Mother failed to secure adequate housing for her children. Her current housing was unsuitable, and she failed to provide evidence of any other housing arrangements. Mother testified that she occasionally worked for a business partner but did not have a permanent job and did not attempt to find employment, which adversely impacted their housing stability.

[¶42]  There was sufficient evidence for the juvenile court to determine it was not in SRS or LS' best interest to return home to Mother. Mother made little, if any, progress over the eighteen months SRS and LS were in DFS custody. Despite SRS' comment to the juvenile court that she wanted to return home, there was sufficient evidence that Mother was unable to provide a safe environment for her children and it was therefore in the children's best interest to change the permanency plan to adoption. The juvenile court did not abuse its discretion.

## *CONCLUSION*

[¶43]  The juvenile court did not abuse its discretion in changing the permanency plan from family reunification to adoption. Affirmed.