# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 3

OCTOBER TERM, A.D. 2025

January 7, 2026

IN THE INTEREST OF: DC, minor child,

AC,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-25-0131

*Appeal from the District Court of Platte County*
*The Honorable Edward A. Buchanan, Judge*

*Representing Appellant:*
Brittany Nicole Thorpe, Thorpe Law Office, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
Keith G. Kautz, Attorney General; Christina Faith McCabe, Deputy Attorney General; Wendy Susan Ross, Senior Assistant Attorney General; Margaret Faye Laing, Assistant Attorney General.

*Representing Guardian ad Litem:*
Joseph R. Belcher, Director; Kimberly Skoutary Johnson, Wyoming Office of Guardian ad Litem, Cheyenne, Wyoming.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL, Justice.**

[¶1]    AC (Father) appeals the juvenile court's order changing the permanency plan from reunification to adoption after the minor child (DC) had been in the State's custody for over eighteen months.  Father argues the juvenile court abused its discretion when it changed the permanency plan to adoption because the only barrier to reunification was his incarceration and the Department of Family Services (Department) failed to make reasonable efforts to reunify Father with his child.  We affirm.

**ISSUE**

I.      **Did the juvenile court abuse its discretion when it changed the permanency plan from family reunification to adoption?**

**FACTS**

[¶2]    Father and Mother are the biological parents of DC, born May of 2023.[1] Approximately two months after DC's birth, the State filed a petition alleging both parents neglected DC by not providing adequate care.  DC had been diagnosed with failure to thrive, and the Department had concerns about DC's health, welfare, and safety.  Based on reports it received, the Department also had concerns about domestic violence, the parents' mental health, child abuse, neglect, and controlled substance use by Father and Mother.

[¶3]    Father denied the allegations, but Mother admitted to them and the juvenile court adjudicated DC as neglected.  The juvenile court removed DC from his parents' care and placed him in the Department's legal and physical custody for familial placement.  The Department placed DC with his maternal grandparents.  The juvenile court initially ordered a permanency goal of family reunification.

[¶4]    The Department developed a case plan for the family that Father signed.  The case plan identified five areas for Father to work on: 1) sobriety, 2) reducing anger and symptoms of trauma, 3) healthy relationships, 4) parenting and child development education, and 5) stability.  Father had discrete, ongoing tasks to complete within each area, which included engaging in mental health counseling and therapy, seeking employment and maintaining employment for six months, finding and obtaining safe housing for six months to demonstrate stability, and following a safety plan to ensure no one would consume or possess drugs or alcohol in the home.

[¶5]    As part of his case plan, Father completed an Addiction Severity Index assessment and a clinical assessment.  The evaluator observed that Father had domestic violence

---

[1] Mother consented to changing the permanency plan to adoption; therefore, we do not discuss Mother unless relevant to Father's appeal.

1

characteristics and recommended he complete an intensive outpatient program for substance abuse treatment.  As part of the Department's predisposition report, Father self-reported that he had been diagnosed with attention deficit disorder, attention deficit hyperactivity, severe bi-polar disorder, severe depression, schizophrenia, obsessive compulsive disorder, post-traumatic stress disorder, and multi-personality disorder.  Father denied any current drug usage but admitted to recent methamphetamine use and past heroin use.

[¶6]    About four months into his plan, Father completed a parental capacity evaluation. The evaluator, Dr. Amanda Turlington, found he had severe manic bipolar I disorder, histrionic personality disorder, moderate stimulant use disorder, and moderate alcohol use disorder. Dr. Turlington also determined that Father lacked the minimal abilities to safely and appropriately parent DC, was below the threshold of a "good enough parent," and was at significant risk of parenting in high-risk ways which correlate with patterns of child abuse and neglect.  Dr. Turlington recommended treatment consistent with these diagnoses. The Department notified the multidisciplinary team (MDT) and Father's counselor of those recommendations.

[¶7]    The juvenile court changed the plan to a concurrent goal of family reunification and guardianship in its July 23, 2024 order.  The MDT met in September of 2024, wherein the team recommended that the permanency plan be changed to family reunification with a concurrent goal of adoption.  On October 1, 2024, the Department filed its quarterly progress report and noted the permanency plan recommendation was family reunification with a concurrent goal of adoption.  In the progress report, the Department noted Mother was failing to achieve many, if not all, her goals and that Father had been incarcerated since June 26, 2024, had struggled to achieve counseling and therapy goals, and had compromised abilities to meet his case plan requirements due to his incarceration.

[¶8]    On December 9, 2024, the MDT met again.  The subsequent MDT report noted Mother still was not meeting many of her case plan goals.  The report also noted Father had expressed a decreased ability to meet his mental health needs due to his incarceration, and even though not feeling suicidal, his schizophrenia issues could use further treatment. The report further stated the Department still had concerns about Father and Mother related to:  1) safety, 2) mental health treatment and the attending of appointments, 3) job stability and the fact that, since the start of the case, Father had five jobs and Mother had seven jobs, 4) Mother had not shown a strong interest in visits with DC when they occurred, 5) attachment between the parents and DC, and 6) Father's current incarceration.  The MDT report also noted that Father was going to plead guilty to felony charges against him in exchange for a concurrent sentence of five to seven years.  The Department therefore changed its recommendation for the permanency plan to adoption.  Father disagreed with the recommendation, but Mother apparently agreed.

[¶9]   On December 26, 2024, the Department filed its quarterly progress report which reflected its changed recommendation from reunification to adoption, as well as many of the successes and failures noted in the prior MDT report.   Among other updates, the report noted the following concerns with Father's progress, including:

- Currently incarcerated at the Platte County Detention Center since 6/26/24 and unable to work on most of his goals; throughout the case, he had been incarcerated a total of 348 days (as of 12/24/24) and is currently waiting for sentencing after pleading guilty for the sexual abuse of a minor in the third degree and accepted a plea deal for 5-7 years.

- Had been recommended to continue intensive outpatient program (IOP) for substance abuse, but due to inconsistencies, had to restart IOP in May of 2024; due to latest incarceration, will have to wait to be released from incarceration to restart IOP.

- Has been attending Volunteers of America (VOA) for individual counseling in jail, however VOA has struggled to get sessions scheduled with the jail; VOA reported Father requested sessions last no more than 30 minutes and at times he did not take accountability or show interest in the sessions.

- Still needs to complete anger management and "thinking for a change" class with VOA, but "thinking for a change" is only done in groups and VOA are unable to accommodate individual sessions.

- VOA has been doing one-on-one parenting classes with him while he is incarcerated, but it reported concerns that he did not take the classes seriously and is not grasping the content.

- Has not secured and maintained safe and appropriate housing for DC for any amount of time, let alone the required six months, even prior to the most recent incarceration.

The report documented that many of Father's case plan goals had not been completed.

[¶10]  On January 7, 2025, the juvenile court held an evidentiary review hearing on the proposed change in the permanency plan.   The State presented three witnesses: the Department's caseworker, Father's probation agent, and DC's foster grandfather.  Father testified on his own behalf, and the State cross-examined him.  DC's guardian ad litem

(GAL) and Father did not call any witnesses or present additional evidence. At the conclusion of the hearing, the juvenile court took the matter under advisement.

[¶11] On February 12, 2025, the juvenile court entered its written order changing the permanency plan to adoption and relieving the Department from further reunification efforts. The juvenile court found the Department had made reasonable efforts to achieve reunification and had provided services that were accessible, available, and appropriate, yet those efforts were unsuccessful. The juvenile court also found that changing the permanency plan to adoption was in DC's best interests.

## STANDARD OF REVIEW

[¶12] We review a juvenile court's order changing a permanency plan for an abuse of discretion. *In re LH*, 2025 WY 28, ¶ 15, 565 P.3d 683, 687 (Wyo. 2025) (citing *In re SK*, 2024 WY 25, ¶¶ 21–22, 544 P.3d 606, 613 (Wyo. 2024)). "To change a permanency plan 'from family reunification to adoption, a juvenile court must find that the Department made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest.'" *In re LH*, ¶ 15, 565 P.3d at 687 (quoting *In re MA*, 2022 WY 29, ¶ 25, 505 P.3d 179, 185 (Wyo. 2022)); *In re RR*, 2021 WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021). "A court abuses its discretion if 'it acts in a manner which exceeds the bounds of reason under the circumstances.'" *In re LH*, ¶ 15, 565 P.3d at 687 (quoting *In re SK*, ¶ 22, 544 P.3d at 613); *In re SRS*, 2023 WY 50, ¶ 21, 529 P.3d 1074, 1080 (Wyo. 2023). We evaluate the sufficiency of the evidence against the preponderance of the evidence standard to determine whether the juvenile court's decision to change the permanency plan is supported by the evidence. *In re JF*, 2025 WY 14, ¶ 14, 562 P.3d 853, 859 (Wyo. 2025); *see also In re LH*, ¶ 15, 565 P.3d at 687. In challenges to the sufficiency of the evidence supporting the juvenile court's decision, "we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party." *In re LH*, ¶ 15, 565 P.3d at 687 (quoting *In re AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021)); *In re JPL*, 2021 WY 94, ¶ 21, 493 P.3d 174, 180 (Wyo. 2021). We give considerable deference to the juvenile court. *In re JF*, ¶ 14, 562 P.3d at 859.

## DISCUSSION

[¶13] If the juvenile court determines that the permanency plan is no longer in the child's best interests and reasonable efforts have been unsuccessful, the court may change the permanency plan. *In re JF*, ¶ 15, 562 P.3d at 859 (citing *KC v. State*, 2015 WY 73, ¶ 25, 351 P.3d 236, 243 (Wyo. 2015)). Whether the Department made reasonable efforts is determined on a case-by-case basis. *In re LC*, 2025 WY 105, ¶ 12, 576 P.3d 1237, 1241 (Wyo. 2025) (citation omitted). When determining whether the Department has made reasonable efforts, the court "must consider whether services to the family have been 'accessible, available and appropriate.'" *In re SK*, ¶ 24, 544 P.3d at 614 (quoting *In re RR*,

4

¶ 97, 492 P.3d at 270); Wyo. Stat. Ann. § 14-3-440(e).  "The Department's efforts must also be tailored to the distinct circumstances of each case."  *In re SK*, ¶ 24, 544 P.3d at 614 (quoting *In re MA*, ¶ 30, 505 P.3d at 186).

[¶14]  To demonstrate reasonable efforts, the Department "must make clear the reasons that necessitated the out of home placement in the first place, and then show how its efforts were directed at remedying those reasons."  *In re LC*, 2025 WY 105, ¶ 12, 576 P.3d 1237, 1241 (Wyo. 2025) (quoting *In re MA*, ¶ 30, 505 P.3d at 186).  The Department's reasonable efforts must be aimed at preventing or eliminating the need for removing children from their home or making it possible for the children to safely return home.  *In re LC*, 2025 WY 105, ¶ 12, 576 P.3d 1237, 1241 (Wyo. 2025); Wyo. Stat. Ann. § 14-3-440(a); *In re MA*, ¶ 29, 505 P.3d at 186 (citing *In re AM*, ¶ 15, 497 P.3d at 920).  "However, when 'determining what reasonable efforts shall be made with respect to a child and in making those reasonable efforts, the child's health and safety shall be the paramount concern.'"  *In re SK*, ¶ 24, 544 P.3d at 614 (quoting *In re JN*, 2023 WY 83, ¶ 14, 534 P.3d 455, 459 (Wyo. 2023)); Wyo. Stat. Ann. § 14-3-440(b).  "To that end, 'timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued.'"  *In re BG*, 2023 WY 40, ¶ 25, 528 P.3d 402, 411 (Wyo. 2023) (quoting *In re VS*, 2018 WY 119, ¶ 43, 429 P.3d 14, 26 (Wyo. 2018); *In re SW*, 2021 WY 81, ¶ 19, 491 P.3d 264, 270 (Wyo. 2021)).  "Further, '[a]n agency is not required to provide services indefinitely when a parent is either unable or unwilling to apply the instruction received.'"  *In re SK*, ¶ 24, 544 P.3d at 614 (quoting *In re SW*, ¶ 26, 491 P.3d at 271).

[¶15]   This Court has also stated:

> Our caselaw is clear: "[e]ven when progress has been made during some point of a case plan, a juvenile court does not abuse its discretion when sufficient progress is not made within a reasonable time."  *In re JN,* 2024 WY 105, ¶ 27, 556 P.3d 748, 756 (Wyo. 2024) (quoting *In re SRS*, 2023 WY 50, ¶ 25, 529 P.3d at 1081).  "Children have a right to stability and permanency in their family relationships."  *In re SRS*, ¶ 30, 529 P.3d at 1082 (quoting *In re JPL*, 2021 WY 94, ¶ 62, 493 P.3d 174, 186 (Wyo. 2021)).  The Child Protection Act recognizes the children's right to stability and permanency is superior to the parent's right to familial association by placing a time limit on the amount of time a child stays in foster care while the parent attempts to rehabilitate.  *In re SRS*, ¶ 30, 529 P.3d at 1082; Wyo. Stat. Ann. § 14-3-431(m) ("When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights[.]").

*In re LH* , ¶ 28, 565 P.3d at 690.  "Children do not have the luxury of time; '[a]t some point, the rights and needs of the children rise above the rights and needs of the parents.'"

*Int. of SMD*, 2022 WY 24, ¶ 35, 503 P.3d 644, 654 (Wyo. 2022) (quoting *Int. of SW*, 2021 WY 81, ¶¶ 27–28, 491 P.3d 264, 271–72 (Wyo. 2021)). "When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *In re BG*, ¶ 27, 528 P.3d at 411 (quoting *SD v. Carbon Cnty. Dep't of Fam. Servs.*, 2002 WY 168, ¶ 27, 57 P.3d 1235, 1241 (Wyo. 2002)).

[¶16] Father argues the juvenile court's order changing the permanency plan from family reunification to adoption was not supported by sufficient evidence the Department made reasonable efforts to reunify him and his child. Specifically, Father contends the Department failed to provide adequate services to him while he was, and continues to be, incarcerated. His argument is focused solely on mental health issues while incarcerated, and he does not claim the Department failed to make reasonable efforts in any other regard. Father also does not challenge the adequacy, availability, appropriateness, or accessibility of the Department's efforts when he was not incarcerated. Indeed, the record shows Father chose to miss many mental health counseling sessions, failed to complete many tasks and requirements, and otherwise failed to take advantage of those services when he was not incarcerated.

[¶17] Father was incarcerated almost 370 days during DC's approximate 18 month foster care placement, and at the time of the January 7, 2025 evidentiary review hearing he was anticipating being sentenced to prison for five to seven years.[2] We have stated that it is imperative that the Department engage in reasonable efforts to reunify children with their parents, even when the parents are incarcerated. *In re BG*, ¶ 28, 528 P.3d at 411.

[¶18] In its evidentiary review hearing order, the juvenile court summarized the efforts the Department had undertaken over the 18 months, finding:

> Here, the Department has provided a multitude of accessible, available, and appropriate services to these parents. The Department has facilitated and provided visitation between the parents and [DC]. It has provided mental health and counseling referrals, including arranging for medication management. The Department has provided these parents with references and referrals for employment and job listings; arranged for parenting classes; provided rental housing applications and rental/landlord referrals. The Department has made arrangements for the parents to attend a financial course; undergo substance abuse treatment; submit to drug testing; and have access to SNAP benefits and food banks. It has hosted multidisciplinary team meetings; developed case plans; and met regularly with these parents and the family. The Department has provided foster care subsidies, respite care; and assistance with other necessities for the minor child. It has provided

---

[2] After the Evidentiary Review Hearing, Father was sentenced to prison for five to seven years pursuant to a plea deal.

for arranged for [*sic*] Early Childhood Center (ECC) and public health visits; parenting classes; a parent capacity evaluation, budget monitoring; gas cards; phone cards; and housing applications. The Department even has ensured ongoing visitation between [Father] and [DC] during [Father's] incarceration by arranging for [DC] to be present at the detention center. Throughout this case, the Department certainly has tailored its efforts at reunification to meet the specific needs of this family. *See SW*, ¶ 20, 491 P.3d at 270.

The record supports the juvenile court's findings. The record is replete with documentation of the Department's reasonable efforts to reunify Father with DC over the entire 18 months, efforts that were tailored to meet the specific needs of DC and his family. *See In re JF*, ¶ 18, 562 P.3d at 860 , and *In are SW*, ¶ 20, 491 P.3d at 270.

[¶19] The Department's efforts were reasonable, accessible, available, and appropriate, even while Father was incarcerated. We have recognized that, "[w]hat is reasonable must take into account [a parent's] incarceration and what services are available under the circumstances." *Int. of BN*, 2022 WY 146, ¶ 32, 520 P.3d 529, 536 (Wyo. 2022) (quoting *Int. of BP*, 2022 WY 128, ¶ 25, 518 P.3d 698, 704–05 (Wyo. 2022)); *see also In re BG*, ¶ 28, 528 P.3d at 411. We have also recognized that any limitation on the scope of efforts is attributable not to the Department, but to the parents' criminal behavior and subsequent incarceration. *Int. of BP*, 2022 WY 128, ¶ 25, 518 P.3d 698, 704–05 (Wyo. 2022) (citing *In re Doe*, 60 P.3d 285, 295 (Haw. 2002); *In re M.T*., 613 N.W.2d 690, 692 (Iowa Ct. App. 2000) (both holding that any limitation on the scope of efforts is attributable not to the Department, but to the parent's criminal behavior and subsequent incarceration)).

[¶20] Father asserts the Department did not do enough to provide mental health services to him while he was incarcerated. The record shows the Department made Father's mental health counseling a priority. In its efforts to address Father's needs, the Department was in constant contact with Father about services being provided to him while he was incarcerated, and actively assisted in addressing any logistical concerns, barriers, or other complications that arose due to Father's incarceration. *See Int. of BN*, ¶ 34, 520 P.3d at 536. The Department facilitated Father receiving individual mental health counseling from VOA, which continued while he was incarcerated. Father complained to the Department that VOA was not providing consistent sessions to him while he was incarcerated. The Department spoke to both VOA and the detention center about Father's complaints, and it did what it could to ensure Father was receiving mental health counseling services.

[¶21] Notwithstanding Father's complaints, VOA reported Father requested sessions last no more than thirty minutes and at times he did not take accountability or show interest in the sessions. To address Father's concerns and ensure he was actually receiving the necessary mental health counseling, the Department sent a new referral to another counseling entity, Mind of Peace, to provide individual counseling to Father. Mind of Peace immediately contacted Father. Father attended a few sessions with Mind of Peace

before discontinuing them. Mind of Peace reported to the Department that Father did not show up for two sessions and had noncompliance issues. The Department then sent a new referral to another counseling service, Specialty Counseling, to provide individual counseling to Father. Specialty Counseling was in the process of setting up individual mental heath counseling sessions at the time of the hearing.

[¶22] The juvenile court further found that, despite all these efforts by the Department, Father had limited success in achieving his case plan goals:

> [Father] remains incarcerated and likely will remain so for the foreseeable future. His sentencing hearing is scheduled for January 14, 2025, and pursuant to a plea agreement, [Father] is facing a sentencing for five-to-seven years of incarceration. In addition, he has other legal matters for which he may face revocation of probation and potential incarcerations.[3] The exact consequences remain to be seen but suffice to say, [Father] likely will be unavailable to parent [DC] for several years. In addition, the evidence revealed that [Father] otherwise has been largely unsuccessful in achieving that which needs to be done for a safe and appropriate reunification with [DC]. He continues to struggle with mental health concerns, relationship issues, housing concerns, financial issues, and an inability to parent [DC]. While he is currently substance-free due to incarceration, there is every reason to be concerned that [Father] will continue to struggle with issues involving methamphetamine, alcohol, and other substances, once they are available to him, given his history and his failure to successfully complete any substance abuse treatment. [Father] does not have stable employment available to him, now or in the near future. He has not successfully completed his counseling requirement or, for that matter, most of the requirements of his case plan. Even when more counseling was available to [Father], he demonstrated a failure to comply and a failure to consistently attend therapy. [Father's] parental capacity evaluation revealed that he lacked minimal abilities to parent [DC] and was below the threshold of being a "good enough" parent. The Court is not convinced that [Father] has done anything to change those results. At this time, [Father] remains unfit and unable to parent [DC]

We again find the record supports the juvenile court's findings regarding Father's case plan successes and failures.

---

[3] The juvenile court footnoted this sentence, stating: At the hearing, it was well supported that [Father] has struggled with criminal behavior and criminal thinking for quite some time. He has been incarcerated more than once; has been on probation and had that probation revoked; and generally, has been unsuccessful in navigating a law-abiding life. We note the record reflects that Father's probation for conspiracy to commit felony theft was revoked on March 17, 2025, for which he was awaiting resolution.

[¶23]   The juvenile court concluded that, although reunification is preferred, it was quite evident that family reunification could not be achieved currently or in the foreseeable future, despite the more-than-sufficient efforts by the Department.  As we acknowledged in *Int. of BN*, even though the Department considered Mother's incarceration when it made efforts to reunify her with her children,  the Department "had no control over when Mother would be released and able to provide a safe and stable living environment for the children."  *Int. of BN*, ¶ 37, 520 P.3d 529, 537.  The same is true for the case before us.  The record shows the juvenile court had ample evidence of the ongoing likelihood of Father's inability to make progress toward reunification.

[¶24]   The record also demonstrates even though the case had been ongoing for approximately eighteen months, Father failed to make sufficient progress on his case plan goals, to DC's detriment.  *See Int. of LH*, ¶ 29, 565 P.3d at 690 (minor child was in the State's custody for eighteen months, Mother failed to make sufficient progress on her case plan goals, specifically on her sobriety and obtaining a safe and stable living environment).  "Even when progress has been made during some point of a case plan, a juvenile court does not abuse its discretion when sufficient progress is not made within a reasonable time."  *Int. of LH*, ¶ 28, 565 P.3d at 690 (quoting *In re JN*, ¶ 27, 556 P.3d at 756).  Father was incarcerated five different times over this period, amounting to approximately 370 days in jail, which interfered with successfully meeting and completing his case plan.  For instance, he had not adequately addressed his mental health issues; he had not been employed for any meaningful length of time; he had not secured safe, stable, and appropriate housing; and he had not saved any money or followed a budget to financially support DC.  *See Int. of LH*, ¶¶ 29, 32, 565 P.3d at 690–91.

[¶25]   The juvenile court determined the evidence showed it was in DC's best interests to change the permanency plan to adoption.  The juvenile court noted that when DC had been placed in the State's custody, he had been diagnosed with failure to thrive, but now he was exceeding expectations and had reached a healthy weight and was meeting developmental milestones.  The juvenile court observed that DC was happy and healthy and the foster grandparents had showered him with love, care, and affection beyond that of a foster family.  The juvenile court further observed that the grandparents had provided DC with stability and consistency necessary for a young child, and they had been responsible for every aspect of DC's physical, mental, emotional, developmental, behavioral, and financial health, to great success.  The juvenile court concluded that DC required permanency after more than 18 months of foster care so that he can continue to benefit from the consistent stability and care that the foster grandparents have provided.  The record supports each of these findings.

[¶26]   As we said in *Int. of SMD*:

> [C]hildren are "afforded the best possible opportunity to get on with the task of growing up [when they are placed] in the most permanent and secure

alternative that can be afforded them." *In re Beatrice M.*, 29 Cal.App.4th 1411, 35 Cal. Rptr. 2d 162 (1994). "[C]hildren have a right to stability and permanency in their family relationships." *Matter of Adoption of MAJB*, 2020 WY 157, ¶ 24, 478 P.3d 196, 204 (Wyo. 2020) (quoting *In re A.D.*, 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109 (Wyo. 2007)). "[L]ong-term stability is critical to a child's future health and development." *In re Davonta V.*, 285 Conn. 483, 940 A.2d 733, 739 (Conn. 2008). Adoption provides finality and long-term stability to children. *See, e.g., In re D.B.*, 246 Ill.App.3d 484, 186 Ill.Dec. 279, 615 N.E.2d 1336, 1340 (1993).

*Int. of SMD*, ¶ 40, 503 P.3d at 656. The juvenile court determined continuing a permanency path of family reunification with a concurrent goal of guardianship would subject DC to continued instability, and we conclude the record adequately supports this determination. As the juvenile court iterated, citing *Int. of SMD*, ¶¶ 35–41, 503 P.3d at 654–56 (Wyo. 2022), where adoption is a feasible option, it generally takes precedence over placement alternatives such as guardianship given its degree of permanence and security.

[¶27] Viewing the evidence in the light most favorable to the State, the juvenile court did not abuse its discretion by changing the permanency plan from family reunification to adoption. Although Father made some progress towards his case plan goals, there was sufficient evidence for the juvenile court to determine it was in DC's best interests to change the permanency plan to adoption. *See In re LH*, ¶ 33, 565 P.3d 683, 691 (finding the juvenile court did not abuse its discretion in changing the permanency plan to adoption when Mother failed to make sufficient progress on the goals of her case plan, in particular, her sobriety, finding a safe and stable place to live, and obtaining steady employment); *In re JN*, ¶¶ 25–27, 556 P.3d at 756 (finding the juvenile court did not abuse its discretion in changing the permanency plan to adoption when Mother failed to make sufficient progress on the goals of her case plan, in particular, her sobriety); and *In re LC*, 2025 WY 105, ¶ 20, 576 P.3d 1237, 1243 (Wyo. 2025) (although Father made some progress by obtaining the psychosexual evaluation shortly before the permanency hearing, the record contains sufficient evidence to change the permanency plan from reunification to adoption). Father's minimal progress during the eighteen months did not achieve permanent stability for DC. "A child should not be forced to endlessly suffer the parentless limbo of foster care." *Int. of SW*, 2021 WY 81, ¶ 27, 491 P.3d 264, 271 (Wyo. 2021) (citations omitted).

## CONCLUSION

[¶28] The juvenile court did not abuse its discretion when it changed the permanency plan from reunification to adoption and allowed the Department to cease reunification efforts. We affirm.